## IN THE UNITED STATES DISTRICT COURT
## FOR NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

WEST FLAGLER ASSOCIATES, LTD.,
a Florida Limited Partnership d/b/a
MAGIC CITY CASINO, and
BONITA-FORT MYERS
CORPORATION, a Florida
Corporation d/b/a
BONITA SPRINGS POKER ROOM,

      Plaintiffs,

v.

RONALD DION DESANTIS, in his
official capacity as Governor of the
State of Florida, and JULIE IMANUEL
BROWN, in her official capacity as Secretary
of the Florida Department of Business
and Professional Regulation,

      Defendants.

_____

## COMPLAINT FOR DECLARATORY JUDGMENT AND <u>INJUNCTIVE RELIEF</u>

      Plaintiffs, West Flagler Associates, Ltd. (hereinafter "West Flagler" or

"Magic City Casino"), and Bonita-Fort Myers Corporation (hereinafter "Bonita

Springs Poker Room") (collectively, "Southwest Pari-mutuels"), by and through

their undersigned counsel, hereby file this Complaint for Declaratory Judgment

and Injunctive Relief against Ronald Dion DeSantis, in his official capacity as

Governor of the State of Florida (hereinafter "Gov. DeSantis") and Julie Imanuel

Brown, in her official capacity as Secretary of the Florida Department of Business and Professional Regulation (hereinafter "DBPR Secretary") (collectively, "Defendants") to enjoin Defendants from cooperating with the Seminole Tribe of Florida (the "Tribe") to secure approval of the 2021 Indian Gaming Compact and/or implementing the provisions of Section 285.710, Florida Statutes, because the online sports betting portions of the 2021 Indian Gaming Compact and Section 285.710 violate Federal law and are therefore *ultra vires*.

## **INTRODUCTION**

1.      Plaintiffs Southwest Pari-mutuels challenge as *ultra vires* portions of the 2021 Gaming Compact (the "2021 Compact"),[1] between the Tribe and the state of Florida (the "State") and Section 285.710, Florida Statutes, (the "Implementing Law"),[2] because they are unauthorized or otherwise unlawful under Federal law pursuant to the Supremacy Clause of the United States Constitution.

2.      Specifically, online gambling, including sports betting, is illegal in Florida.  The Implementing Law purports to legalize it, but only if conducted by the Tribe under the 2021 Compact.  It remains illegal otherwise.

---

[1]      A true and correct copy of the 2021 Compact is attached hereto as ***Exhibit A***.

[2]      A true and correct copy of Senate Bill 2-A:  Implementation of the 2021 Gaming Compact Between the Seminole Tribe of Florida and the state of Florida, which amended Section 285.710, Florida Statutes, is attached hereto as ***Exhibit B***.

3.      Plaintiffs seek declaratory and injunctive relief pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202 and Federal Rules of Civil Procedure 57 and 65 on the grounds that the 2021 Compact and the Implementing Law unlawfully purport to authorize off-reservation sports betting by allowing anyone with a mobile phone or computer to place and collect online wagers on sporting events "via the internet [or] web application" from anywhere in Florida or to place sports bets at off-reservation Florida pari-mutuels chosen by the Tribe—all without being physically present on Indian lands.[3]

4.      Pursuant to the 2021 Compact and the Implementing Law, sports bets initiated by persons located physically anywhere within Florida (or even outside the state) are "deemed" to have occurred on Indian lands because the "servers" and "devices" purportedly receiving the bets are to be located on the Tribe's reservation.

5.      "Deeming" the bet to have been placed on Indian lands because the servers are located there contradicts decades of well-established precedent interpreting applicable federal law.  Contrary to the legal fiction created by the 2021 Compact and Implementing Law, a bet is placed both where the bettor and the casino are each located.  *See* Brief for the United States of America as Amicus Curiae Supporting Appellee, *Couer d'Alene Tribe v. AT&T Corporation*, 1999 WL

---

[3]      The 2021 Compact adopts the definition of "Indian lands" set forth in 25 U.S.C. § 2703(4), which is used herein.

33622333, at *13-14 (9th Cir. Case No. 99-35088, July 20. 1999) ("It follows that 'wagering,' 'gambling,' or 'gaming' occur in both the location from which a bet, or 'offer,' is tendered and the location in which the bet is accepted or received").[4]

6.     The off-reservation sports betting sections of the 2021 Compact and the Implementing Law are *ultra vires* for at least three (3) reasons:  (1) the 2021 Compact is unauthorized under the Indian Gaming Regulatory Act ("IGRA") because they purport to allow bettors to place bets on sporting events from outside the Tribe's six (6) reservations, although the bettors are not on "Indian land" as defined in the IGRA, 25 U.S.C. § 2703(4); (2) the 2021 Compact and the Implementing Law violate the Wire Act of 1961 ("Wire Act") by purporting to allow bettors to place online bets on sporting events from outside the Tribe's six (6) reservations and through the means of interstate commerce, because sports betting is illegal in Florida; and (3) the 2021 Compact and Implementing Law violate the Unlawful Internet Gaming Enforcement Act ("UIGEA") by purporting to allow bettors to place online bets on sporting events from outside the Tribe's six (6) reservations, because such bets are illegal where placed.

7.     Because controlling federal law preempts conflicting state law under the Supremacy Clause of the United States Constitution, the off-reservation sports

---

[4] The Ninth Circuit Court of Appeals did not reach the merits of the case, as it held the appellant, AT&T, lacked standing to challenge the compact. *AT&T Corp. v. Coeur d'Alene Tribe*, 295 F.3d 899 (9th Cir. 2002).

4

betting provisions of the 2021 Compact and the Implementing Law are invalid and thus *ultra vires*.

8.     Southwest Pari-mutuels seek judicial intervention to declare the off-reservation sports betting portions of the 2021 Compact and the Implementing Law *ultra vires* and enjoin:  (a) Gov. DeSantis from cooperating with the Tribe to secure approval of the 2021 Compact in its current form as mandated by the Implementing Law; and (b) the DBPR Secretary from implementing the provisions of § 285.710, Florida Statutes, with respect to sports betting from anywhere outside the Tribe's reservations.[5]

## **PARTIES**

9.     Plaintiff West Flagler is a limited partnership registered in the State of Florida, formed in 1963, with its principal place of business located at 401 N.W. 38th Court, Miami, Florida, 33126.  West Flagler has been owned and operated by the Havenick family for over 65 years when the patriarch of the family, Isadore Hecht, bought Flagler Greyhound Park in the early 1950s.

10.     Since 2009, West Flagler has owned and operated the casino that has been known as Magic City Casino located at 540 N.W. 37th Ave, Miami, Florida,

---

[5]     Plaintiffs hereby reserve all rights to challenge the lawfulness of the 2021 Compact under the Florida Constitution in the state courts of Florida.  This Complaint is limited to claims arising under federal law, and it does not seek relief pursuant to the state constitution.

33125.  Magic City Casino is a licensed pari-mutuel[6] facility authorized to operate a jai alai fronton, a dog track,[7] slots and a card room.

11.     Magic City Casino, under the name Magic City Racing, also sponsors thoroughbred racehorses that compete on local tracks such as Gulfstream Park under the name Magic City Racing Silks.

12.     Magic City Casino has held a pari-mutuel permit to conduct greyhound racing in Miami-Dade County for over 50 years.  In 1996, the state also permitted "simulcasting," which allowed customers physically present at Magic City Casino's track to bet on other jai alai, horse and dogs races broadcasts from tracks around the nation.

13.     Under §849.086, Florida Statutes, licensed pari-mutuel facilities may also operate cardrooms.  Magic City Casino began operating poker rooms in 1996 with a $10 pot limit that permits unlimited pot poker games.  In addition, the casino currently has a separate poker room at the facility that is open seven (7) days a week and features nineteen (19) tables, spreading the most popular games such as limit and no limit Texas hold'em, Omaha, and 7-card stud.

---

[6]      "Pari-mutuel" means a system of betting on races or games in which the winners divide the total amount bet, after deducting management expenses and taxes, in proportion to the sums they have wagered individually and with regard to the odds assigned to particular outcomes.  *See* § 550.002(22), Fla. Stat.

[7]      As a result of voter approval of Amendment 13 in 2018, live greyhound racing was banned in Florida as of January 1, 2021.  However, broadcasting greyhound racing for wagering from other locations is still permitted at Florida pari-mutuels.

14.     Pursuant to the 2004 Florida constitutional amendment authorizing slot machines in Miami-Dade and Broward Counties, Magic City Casino's greyhound racing facility qualified as an "eligible facility" for slot machine gaming.  The casino was added to Magic City Casino's greyhound racetrack in October of 2009 and was the first casino in Miami to offer Las Vegas-style slot machines, which were authorized by Florida and Miami-Date County's voters in 2004 and 2008, respectively.  Magic City Casino offers over 800 slot machines, electronic table games, such as blackjack, roulette, craps and baccarat, poker tables and tournaments, off track betting and other live entertainment that draws in both in-state and out-of-state visitors.

15.     Even though live greyhound and other dog racing were banned in Florida through a 2018 constitutional amendment, slots and poker were allowed to continue as "grandfathered" businesses.  *See* Fla. Const. Art. X, § 32.

16.     Magic City Casino's greyhound track underwent extensive renovations to build out the casino.  To date, over $55,000,000 have been spent on capital improvements and Magic City Casino continues to make additional capital improvements to the casino each year.  In 2018, following a successful declaratory judgment confirming that a jai alai permit holder is an "eligible facility" under the state's slot machine law, Magic City Casino added live-action jai alai and a state-of-the-art glass-walled jai alai fronton.  Magic City Casino has its own jai-alai roster

and, prior to COVID-19, was drawing over 1,000 fans per week.  Simulcast betting is open 7 days a week, year-round, and the performances are simulcast to 15 additional pari-mutuel sites, with a daily viewing audience of over 5,000 people.  In 2020, Magic City Casino launched its Jai Alai Channel on YouTube.

17.     Magic City Casino has approximately 425 employees and is located less than thirty (30) miles from the Tribe's Hard Rock Hollywood Casino and competes with the Tribe for gaming patrons.

18.     Plaintiff Bonita-Fort Myers Corporation d/b/a Bonita Springs Poker Room is a corporation registered in the State of Florida, formed in 1956, with its principal place of business located at 401 N.W. 38th Court, Miami, FL 33126.  Bonita Springs Poker Room is an affiliate of Magic City Casino and opened its card room at 28010 Race Track Road, Bonita Springs, FL 34135 in October 2020.  Newly constructed after the closure of the Naples-Fort Myers Greyhound Track by the Havenick family, Bonita Springs Poker Room operates a 37-table live casino-style poker room, a state-of-the-art sports room where patrons can wager on simulcast horse racing and jai-alai, and a taproom with over 150+ craft beers from around the world.

19.     Prior to the opening of the Bonita Springs Poker Room in October 2020, the Havenick family owned and operated the Naples-Fort Myers Greyhound Racing & Poker in Bonita Springs for over 50 years.

20.     Following the 2018 constitutional amendment prohibiting wagering on live racing by greyhounds or other dogs, the racetrack was closed in May 2020 and scheduled for demolition in the summer of 2021.  A new 32,000-square foot facility that cost approximately $10,000,000 was constructed to house what is now the Bonita Springs Poker Room.  Similar to its sister property, Magic City Casino, the Bonita Springs Poker Room offers simulcast of horse racing and jai-alai where patrons can place bets and wagers on the events.

21.     The Bonita Springs Poker Room features such games such as ultimate Texas hold'em, three-card poker, high-card flush, jackpot hold'em and DJ wild, year round.  It is located approximately twenty-one (21) miles from the Tribe's Immokale Casino, and one hundred and fifty (150) miles from the Tribe's Tampa Hard Rock Casino.  With approximately 150 employees, it also competes with the Tribe for gaming patrons.

22.     Both Magic City Casino and Bonita Springs Poker Room are owned by a Florida corporation called Southwest Florida Enterprises, Inc.

23.     Defendant, Ronald Dion DeSantis ("Gov. DeSantis"), is the current Governor of the State of Florida (the "State").   By law, the Governor is the,designated state officer responsible for negotiating and executing, on behalf of the State, tribal-state gaming compacts.  § 285.712(1), Fla. Stat.  Pursuant to § 285.710(3)(b), Florida Statutes, the "Governor shall cooperate with the Tribe in

seeking approval of such compact ratified and approved under this paragraph from the United States Secretary of the Interior."  Gov. DeSantis is being sued in his official capacity.

24.    Defendant, Julie Imanuel Brown, is the Secretary of the Florida Department of Business and Professional Regulation ("DBPR").  The DBPR's Division of Pari-Mutuel Wagering is responsible for regulating pari-mutuels and managing any compact between the Tribe and the State.  §§ 550.01215, 550.0251, 285.710(7), Fla. Stat.  Although the Implementing Law created the Florida Gaming Control Commission pursuant to §285.710(1)(f), Florida Statutes, such legislation does not take effect until July 1, 2022.  In the interim, the Division of Pari-Mutuel Wagering continues to regulate pari-mutuels, including the issuance of permits, and management of any compact between the Tribe and the State.  The DBPR Secretary is being sued in her official capacity.

## JURISDICTION AND VENUE

25.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because the matters in controversy arise under the laws of the United States.

26.    Venue is proper in this District, in the Tallahassee Division, under 28 U.S.C. § 1391(b) because under Florida's home venue privilege, when a civil action is brought against the state or one of its agencies or subdivisions, venue lies properly

in the county where the state, agency, or subdivision, maintains its principal headquarters and the seat of government.  The offices of the Governor and the DBPR are located in the City of Tallahassee, Leon County, Florida.

## STATUTORY AND REGULATORY BACKGROUND

27.    There are two types of casino gaming in the United States:  (i) "tribal" gaming operated by Indian tribes (or private parties who are permitted to manage tribal casinos, which remain the sole proprietary interest of the tribe) on Indian lands pursuant to the IGRA; and (ii) "commercial" gaming operated by private entities on non-Indian lands, which are governed by state law, such as casino gaming conducted in Las Vegas, Atlantic City or the slots approved by voters in Miami-Dade and Broward Counties.

28.    Both types of casino gaming must still comply with applicable federal law.

### *Tribal Gaming:  The Indian Gaming Regulatory Act*

29.    By enacting the IGRA in 1988, Congress created a comprehensive framework for regulation of tribal gaming on tribal lands.  Among other things, the IGRA created the National Indian Gaming Commission ("NIGC"), an independent federal regulatory agency within the Department of Interior ("DOI") focused solely on the regulation of Indian gaming on tribal lands.

30.    In enacting the IGRA, Congress found that "Indian tribes have the exclusive right to regulate gaming activity **on Indian lands** if the gaming activity **is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity**."  25 U.S.C. § 2701(5) (emphasis supplied).

31.    Binding precedent dictates that the "IGRA affords tools . . . to regulate gaming on Indian lands, **and nowhere else**." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 795 (2014) (emphasis supplied).

32.    The IGRA categorizes gaming into three classes[8] and allocates authority to regulate such gaming on Indian lands.

33.    Class III gaming, at issue here, is defined as "all forms of gaming that are not class I or class II gaming."  25 U.S.C. § 2703(8).  Class III gaming includes, but is not limited to, slot machines, any house banking game, sports betting, and lotteries.  25 C.F.R. § 502.4.

34.    The IGRA allows federally recognized tribes to conduct Class III gaming that is "lawful on Indian lands" *only* if such gaming is:  (a) authorized by a

---

[8]    Class I gaming includes "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as part of, or in connection with, tribal ceremonies or celebrations."  25 U.S.C. § 2703(6).  Class II gaming includes bingo and non-banking card games.  Expressly excluded from Class II gaming is banking card games (such as blackjack, baccarat and chemin de fer), electronic games of chance, and slot machines.  *Id.* at § 2703(7).  As a result, these games all fall into Class III gaming.

tribal ordinance or resolution approved by the NIGC's Chairman; (b) located in a state that permits such gaming; *and* (c) conducted in conformance with a tribal-state compact.  *See* 25 U.S.C. § 2710(d)(l).

35.     If a state legalizes Class III gaming, the IGRA grants a tribe the right to demand that the state engage in good faith negotiations with the tribe to enter into a compact authorizing such gaming on tribal lands.  25 U.S.C. § 2710(d)(3)(A) (a state "shall negotiate with the Indian tribe in good faith to enter into such a compact").  If the parties successfully negotiate a compact and the DOI's Secretary approves it, the compact takes effect when notice of approval is published in the Federal Register. *Id*. at §§ 2710(d)(3)(B), (d)(8)(D).

36.     Under § 2710 of the IGRA, the DOI's Secretary can approve or disapprove of the compact, or, in the event no affirmative action disapproving the compact is taken after forty-five (45) days, the compact is "deemed approved," although it must still comply with all applicable federal law.

37.     Pursuant to the IGRA, the DOI Secretary has a legal obligation to disapprove a tribal-state compact purporting to authorize gaming if the compact violates:  (1) any provision of the IGRA; (2) "any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands;" or (3) "the trust obligations of the United States to Indians."  25 U.S.C. § 2710(d)(8)(B).

38.    The DOI's Secretary's obligation is both mandatory and judicially enforceable. *Amador Cnty. v. Salazar*, 640 F.3d 373, 379-83 (D.C. Cir. 2011).

39.    The DOI's Secretary cannot approve a compact ratified in violation of federal law. *See* 25 U.S.C. § 2710(d)(8)(B)(ii).

40.    The IGRA restricts tribal gaming to "Indian lands," which are either Indian reservations or lands held in trust by the United States for the benefit of a federally recognized Indian tribe. *See* 25 U.S.C. § 2703(4).

41.    Importantly, the IGRA does not authorize tribal gaming outside of Indian lands (unless there is an applicable exception). *See* 25 U.S.C. §§ 2701(5); 2702(3); 2710(a), (b)(1), (d)(l).[9]  No exception applies here.

42.    The NIGC has consistently maintained the position that the IGRA does not provide for any form of gaming off Indian lands. *See* Letter from Kevin Washburn, General Counsel, NIGC, to Joseph Speck, Nic-A-Bob Productions, re: WIN Sports Betting Game (Mar. 13, 2001) ("The use of the Internet, even though the computer server may be located on Indian lands, would constitute off-reservation

---

[9]    The exceptions, not applicable here, are for lands acquired for Indians in trust by the DOI Secretary after October 17, 1988, if the land is (1) acquired after the DOI Secretary determines acquisition to be in the best interest of the tribe and not detrimental to the local community and the governor of the state concurs; (2) acquired for tribes that had no reservation on the date of enactment of IGRA; (3) acquired as part of a land claim settlement; (4) acquired as part of an initial reservation for a newly recognized tribe; and (5) acquired as part of the restoration of lands for a tribe restored to federal recognition. 25 U.S.C. § 2719(a)-(b).

14

gaming to the extent any of the players were located off Indian lands."); Letter from Kevin Washburn, General Counsel, NIGC, to Robert Rossette, Monteau, Peebles & Crowell, re: Lac Vieux Dessert Internet Bingo Operation (Oct. 26, 2000) (as the [Indian operated internet bingo] "seeks to draw any player who can log on to the internet site from any location and who is willing to pay the fee . . . The game itself does not depend on the player being located in a tribal bingo facility or even on Indian lands" and is not authorized by IGRA); Letter from Penny J. Coleman, Deputy General Counsel, NIGC, to Terry Barnes, Director of Gaming, Bingo Networks (June 9, 2000) (concluding game described as a center located on tribal lands but allowing players to open an account with the gaming center through the Internet was off-reservation gaming not authorized by the IGRA); Letter from Kevin Washburn, General Counsel, NIGC, to Ernest L. Stensgar, Chairman, Coeur d'Alene Trien, re: National Indian Lottery (June 22, 1999) (concluding an Indian internet lottery gambling enterprise, involving off reservation gaming, was not authorized by the IGRA) (collectively, the "NIGC Letters") ; *see also* Amicus Brief of the United States, 1999 WL 33622333 at *2, *9 (arguing for affirmance of district court decision holding that the IGRA did not authorize interstate National Indian Lottery through telephonic communications connecting tribal reservations in several states). True and correct copies of the NIGC Letters are attached hereto as Composite *Exhibit C*.

43.     The IGRA grants neither the NIGC nor the Chairman of the NIGC any jurisdiction to exercise regulatory authority over gaming conducted off Indian lands.

## *Gambling Via Wires:  The Wire Act Of 1961*

44.     The Wire Act of 1961, 18 U.S.C. §§ 1081, *et seq.*, applies to transmissions in interstate or foreign commerce and prohibits interstate online sports betting.  Specifically, the Wire Act makes it illegal for:

> Whoever being engaged in the business of **"betting or wagering"** knowingly uses a ***wire communication facility*** for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the bets or wagers ***on any sporting event or contest***, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers…

18 U.S.C. § 1084(a) (emphasis supplied).

45.     "Wire communication facility" is defined as "any and all instrumentalities, personnel, and services (among other things, the receipt, forwarding, or delivery of communications) used or useful in the transmission of writings, signs, pictures, and sounds of all kinds by aid of wire, cable, or other like connection between the points of origin and reception of such transmission."  18 U.S.C. § 1081.   Telephone or cellular communications, debit or credit card transactions, and bank wire or credit card transfers are common examples of wire communication facilities.

46.     Wagering via the Internet or by mobile phone can involve interstate commerce because the wire and cellular transmissions that make data transmission possible to be sent and received routinely cross state lines.

47.     In fact, although a player may be located in one state, his or her Internet transaction will likely be transmitted to a satellite and that signal is transmitted down to a ground station before being routed to intended receiving servers.

48.     Moreover, credit or debit card transactions are transmitted through a network and involve acquiring, processing and issuing credits and debits to or from banks or card processors at multiple locations throughout the United States.

49.     The Tribe operates seven (7) casinos in Florida and is engaged in the business of "betting and wagering" under 18 U.S.C. §1084.

50.     The Wire Act prohibits the Tribe, or any other casino located in a state that prohibits sports betting, from transmitting several types of wagering-related communications by knowingly:

> (1)     using the internet for the transmission of bets or wagers on any sporting event or contest;
> (2)     using the internet for the transmission of information assisting in the placing of bets or wagers on any sporting event or contest;
> (3)     transmitting a bank wire transfer which entitles the recipient to receive money or credit as a result of bets or wagers; and
> (4)     transmitting a bank wire transfer which entitles the recipient to receive money or credit for information assisting in the placing of bets or wagers.

*See* 18 U.S.C. § 1084(a).

17

51.    The Wire Act contains a very narrow exception for interstate transmissions where the transmission is "from a **_State_** or foreign country where betting on that sporting event or contest is legal into a **_State_** or foreign country in which such betting is legal."  18 U.S.C. § 1084(b) (emphasis supplied).

52.    Under the Wire Act, "State" means a "State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or a commonwealth, territory or possession of the United States."  18 U.S.C. § 1084(e).

53.    The exceptions to the Wire Act do not apply to the 2021 Compact because the Tribe is not a "State" as that term is defined under the Wire Act nor is the Tribe a "foreign country."

54.    Instead, the Tribe is a "federally-recognized tribal government possessing sovereign powers and rights of self-government." **_Ex. A, 2021 Compact_**, Part II, Sec. A; _see also_ https://www.semtribe.com/stof/history/introduction ("We [the Tribe] are a sovereign government with our own schools, police, and courts.").

55.    Except as otherwise specified in law, casino gambling, including sports betting, is illegal in Florida.  By constitutional amendment adopted by the voters in 2018 ("Amendment 3"), the legislature cannot authorize casino gambling unless approved by the voters pursuant to a citizen's initiative.  Fla. Const. Art. X, § 30.

56.    In an effort to circumvent this clear prohibition in the State constitution, the 2021 Compact and Implementing Law provide that a person sitting on her

18

poolside lounge chair or his couch at home placing a sports bet through the Tribe is "deemed" not to be placing a bet that is otherwise illegal in the state. The 2021 Compact unlawfully deems the bet to be placed on the Tribe's reservation, where the servers will be located. However, this is nothing more than a legal fiction belied by the fact that sports betting is still taking place outside the Tribe's reservations in a state where sports betting remains illegal.

57.    The 2021 Compact violates the Wire Act in that it permits the placement of a bet or wager on sports events from outside the Tribe's reservations using an electronic device that is connected to a server on the Tribe's reservations via the Internet, a cellular signal, or a web application.

### *Online Gambling:  The Unlawful Internet Gambling Enforcement Act*

58.    Congress enacted the Unlawful Internet Gambling Enforcement Act ("UIGEA") in 2006 to strengthen the enforcement of existing prohibitions against illegal gambling on the Internet. *See* 31 U.S.C. § 5361(4).

59.    The UIGEA prohibits anyone "engaged in the business of betting or wagering" from "knowingly accept[ing]" various kinds of payments "in connection with the participation of another person in unlawful Internet gambling." *Id*.

60.    Unlawful Internet gambling occurs when an individual places, receives or transmits a "bet or wager by any means which involves the use, at least in part, of the Internet where such bet or wager is unlawful under any applicable Federal or

State Law in the State or Tribal lands in which the bet or wager is initiated, received or otherwise made." *See* 31 U.S.C. § 5362(10)(A).

61.     Under the UIGEA, for a bet or wager placed over the Internet to be lawful, the bet must be legal **in the State or Tribal lands where** the bet or wager is **placed *and* in the State or Tribal lands where** the bet or wager is **received**. *See* 31 U.S.C. § 5362(10)(A).

62.     "Bet or wager" includes the "staking or risking by any person of something of value upon the outcome of a contest of others, *a sporting event*, or a game subject to chance, upon an agreement or understanding that the person or another person will receive something of value in the event of a certain outcome." *See* 31 U.S.C. § 5362(1)(A) (emphasis supplied).

63.     A "bet or wager" has at least three components:  (1) a decision by a person to risk something of value; (2) an agreement between that person and another person that the bettor will receive something of value in the event of a certain outcome; and (3) the payment or delivery of the thing of value in payment of the bet. *See* Amicus Brief of the United States, 1999 WL 33622333, at *13.

64.     The UIGEA excludes from coverage certain bets or wagers that are "initiated and received or otherwise made **exclusively within a single *State***" and done so in accordance with the laws of such state, even if the routing of those wire

transmissions was done in a manner that involved interstate commerce.  *See* 31 U.S.C. § 5362(10)(B) (emphasis supplied).

65.    The term "States" means any "State of the United States, the District of Columbia, or any commonwealth, territory or other possession of the United States." *See* 31 U.S.C. § 5362(9).

66.    The Tribe is not a "State" under the UIGEA.

67.    The UIGEA also excludes from coverage certain bets or wagers that are "initiated and received or otherwise made **exclusively *within* the Indian lands of a single Indian tribe** (as such terms are defined under the Indian Gaming Regulatory Act); or between the Indian lands of 2 or more Indian tribes to the extent that intertribal gaming is authorized by the Indian Gaming Regulatory Act."  *See* 31 U.S.C. § 5362(10)(C) (emphasis supplied).

68.    Neither the 2021 Compact nor the Implementing Law fits within either of the foregoing exceptions.

69.    There is no exception for online bets or wagers placed in a State from outside Indian lands *to* any Indian lands located in a state where the bet or wager is otherwise unlawful.  *See California v. Iipay Nation of Santa Ysabel* ("*Desert Rose*"), 898 F.3d 960, 967 (9th Cir. 2018) (holding that gaming that does not occur on Indian lands is not subject to jurisdiction under the IGRA and the IGRA cannot serve as a shield  from the application of the UIGEA).

21

70.     Because sports betting is illegal in Florida, a bet or wager that is placed from outside the Tribe's reservations using an electronic device that is connected via the Internet, cell signal or web application to a server on the Tribe's reservations, violates the UIGEA.

### *Florida Gambling Law*

71.     Except for a few statutorily approved exceptions, gambling in Florida is largely illegal.  *See generally* Ch. 849, Fla. Stat.; The Florida Senate-Bill Analysis and Fiscal Impact Statement, SB 2A Implementation of the 2021 Gaming Compact, Prepared By:   The Professional Staff of the Committee on Appropriations https://www.flsenate.gov/Session/Bill/2021A/2A/Analyses/2021s00002A.pre.ap.PDF (last visited July 1, 2021).

72.     For example, Florida law prohibits keeping a gambling house, running a lottery,[10] or the manufacture, sale, lease, play, or possession of slot machines.  *See* § 849.01, Fla. Stat; § 849.09, Fla. Stat.; § 849.15, Fla. Stat.

73.     However, the following gaming activities are authorized by law and regulated by the state:

        (1)     Pari-mutuel wagering at licensed horse tracks and jai alai frontons;[11]

---

[10]     The state's voters approved a *state-run* lottery by constitutional amendment in 1986.

[11]     § 849.086, Fla. Stat.

(2)     Slot machine gaming at certain licensed pari-mutuel locations in

Miami-Dade County and Broward County;[12] and

(3)     Cardrooms at licensed pari-mutuel facilities.[13]

74.     Under certain specific and limited conditions, the conduct of penny-ante games, bingo, charitable drawings, game promotions (sweepstakes), and bowling tournaments are also permitted.  *See* § 849.085, Fla. Stat.; § 849.0937, Fla. Stat.; § 849.0935, Fla. Stat.; § 849.094, Fla. Stat.; § 849.141, Fla. Stat.

75.     During the 2018 General Election, the Florida electorate overwhelmingly approved a constitutional amendment, now Article X, Section 30 of the Florida Constitution ("Amendment 3") seeking to limit the expansion of gambling in the state.

76.     Amendment 3 provides that a vote proposed by a citizen initiative to amend the State Constitution pursuant to Article XI, Section 3 of the State Constitution is the *exclusive* method of authorizing "casino gambling" in Florida:

> This amendment ensures that Florida voters shall have the exclusive right to decide whether to authorize casino gambling in the State of Florida.  This amendment requires a vote by citizens' initiative pursuant to Article XI, section 3, in order for casino gambling to be authorized under Florida law.  This section amends this Article; and also affects Article XI, by making citizens'

---

[12]     Art. X, § 23, Fla. Const.
[13]     § 849.086, Fla. Stat.

initiatives the exclusive method of authorizing casino
gambling.

77.     As used in Amendment 3, "casino gambling" means "any of the types

of games typically found in casinos and that are within the definition of Class III

gaming in the Federal Indian Gaming Regulatory Act, 25 U.S.C. ss. 2701 et seq.

("IGRA"), and in 25 C.F.R. s. 502.4, upon adoption of this amendment, and any that

are added to such definition of Class III gaming in the future."

78.     No voter-initiated petition has amended the state Constitution to

legalize sports betting in Florida.

79.     Sports betting remains illegal in Florida.  *See* § 849.14, Fla. Stat.

## FACTUAL BACKGROUND

80.     The Tribe is the only tribe in Florida that has negotiated a gaming

compact with the State.

81.     The Tribe has seven (7) existing facilities on six (6) reservations

statewide:  Seminole Indian Casino-Brighton, Seminole Indian Casino-Coconut

Creek, Seminole Indian Casino-Immokalee, Seminole Indian Casino-Big Cypress,

Seminole Hard Rock Hotel & Casino-Hollywood and Seminole Hard Rock Hotel

and Casino-Tampa.

82.     On November 14, 2007, the Tribe signed a compact with then Florida

Governor Charlie Crist (the "2007 Compact").  The 2007 Compact expanded casino

gaming, permitting the Tribe to offer within its reservations slots, and card games,

24

such as blackjack and baccarat, that were otherwise prohibited by law. On January 7, 2008, upon publication of the DOI's Secretary approval, the 2007 Compact went into effect.

83.     The Florida Legislature did not authorize Governor Crist to negotiate the 2007 Compact before it was signed and has not ratified it since. Shortly after the 2007 Compact was signed, the Florida House of Representative and its Speaker filed a petition for a writ of quo warranto in the Supreme Court of Florida, disputing then-Governor Crist's authority to unilaterally bind the state to the 2007 Compact.

84.     In *Florida House v. Crist*, 990 So. 2d 1035 (Fla. 2008), the Florida Supreme Court held that then-Governor Crist lacked authority under the Florida Constitution when he executed a compact that changed the state's express public policy as set forth in criminal statutes and legislation. Because the type of gaming the compact authorized was prohibited under state law, Governor Crist had exceeded his authority and could not bind the state to the 2007 Compact.

85.     As the Supreme Court aptly noted, "[n]either the Governor nor anyone else in the executive branch has the authority to execute a contract that violates state criminal law." *Crist*, 990 So. 2d at 1050.

86.     In 2010, following the Florida Supreme Court's decision in *Florida House v. Crist*, Florida enacted a statute addressing tribal-state gaming compacts and providing that the Governor is the "designated state officer responsible for

negotiating and executing, on behalf of the state, tribal-state gaming compacts with federally recognized Indian tribes located within the state" to authorize "class III gaming, as defined in [the IGRA], **on Indian lands within the state**." § 285.712(1), Fla. Stat. (emphasis supplied).

87.     As recognized by the state Supreme Court and enshrined in statute, the Florida Legislature must ratify the compact for it to be effective.  §§ 285.712(2) - (3), Fla. Stat.  The Governor is thereafter directed to file the ratified, executed compact with the Florida Secretary of State, who is to then forward a copy of the executed compact and the ratifying act to the DOI for review and approval by the DOI Secretary, in accordance with 25 U.S.C. § 2710(d)(8).  *See* §§ 285.712(3) - (4), Fla. Stat.

88.     In accordance with this process, on April 7, 2010, then-Governor Crist and the Tribe executed a new compact (the "2010 Compact"), that was ratified by the Florida Legislature and submitted for approval by the DOI, which approval was announced in the Federal Register on July 6, 2010.

89.     The 2010 Compact, which is still in effect, has a term of 20 years, ending July 31, 2030.

90.     The 2010 Compact allows the Tribe to operate slot machines, banking or banked card games, including baccarat, chemin de fer and blackjack, and raffles and drawings in exchange for a revenue share payment in the amount of twelve

million five hundred thousand dollars ($12,500,000) per month through the first two years of the 2010 Compact, in addition to the revenue sharing cycle that begins after the initial two-year period.

91.     The 2010 Compact contains an "exclusivity" clause providing that if any other entity was authorized to operate Class III gaming or any new forms of Class III gaming or other casino-style gaming that was not in operation as of February 1, 2010, the Tribe is no longer required to pay Florida its share of the revenue until such gaming was no longer operated.

92.     In 2011, pari-mutuels began operating their own designated-player games at cardrooms.  In 2014, state regulators adopted an official rule allowing designated-player games at cardrooms, thereby allowing the pari-mutuel cardrooms to conduct designated-player games in which players compete only against each other.

93.     The Tribe took the position that these designated-player games violated the exclusivity provisions of the 2010 Compact and, thereby, relieved it of the obligation to continue paying revenue sharing to the state under the 2010 Compact.

94.     In 2016, the Tribe sued the State in this Court.  The Tribe asserted that Florida gambling regulators broke their exclusivity agreement by allowing pari-mutuels to offer "banked" card games.  Under the 2010 Compact, if the "State permits any other person, organization or entity, except for any other federally

recognized tribe" to conduct banked card games, the Tribe can continue to offer the banked card gaming without sharing any revenue with the state.

95.     When the Tribe prevailed in the federal lawsuit, it stopped all revenue sharing to the State.[14]

96.     In ensuing years, the State had tried and failed, until now, to negotiate a new compact with the Tribe and revive the revenue sharing.

### *The 2021 Compact and the Implementing Law*

97.     On April 23, 2021, Gov. DeSantis and the Tribe signed the 2021 Compact.

98.     The 2021 Compact is intended to supersede the 2010 Compact.  Once effective upon publication of approval by the DOI Secretary, the 2021 Compact has a thirty (30) year term, terminating July 31, 2051.  *Ex. A, 2021 Compact*, Part XVI, Sec. A.

99.     Under the 2021 Compact, the Tribe is authorized to offer "Covered Games" on its reservations.  *Ex. A, 2021 Compact*, Part IV, Sec. A.

100.   Covered Games means:  (1) slot machines; (2) raffles and drawings; (3) table games; (4) "Fantasy Sports Contest(s)"; (5) "Sports Betting"; and (6) any new

---

[14]     The State sought to repeal previously adopted designated-player rules that caused the alleged 2010 Compact violation.  However, the Florida First District Court of Appeal enjoined the repeal.  *Dep't of Bus. & Pro. Regul. v. Dania Enter. Ctr., LLC*, 229 So. 3d 1259 (Fla. 1st DCA 2017).

game authorized by Florida law for any person for any purpose. *See **Ex. A, 2021 Compact**, Part III, Sec. F.*

101.   The 2021 Compact is similar to the 2010 Compact in that it continues to allow the Tribe to conduct slot machines, raffles and drawings, and banked card games, including baccarat, chemin de fer, and blackjack.

102.   However, the 2021 Compact allows the Tribe to conduct new forms of gaming, including craps, roulette, "Fantasy Sports Contests" and "Sports Betting."

103.   The 2021 Compact defines "Sports Betting" as:

> wagering on any past or future professional sport or athletic event, competition or contest, any Olympic or international sports competition event, any collegiate sport or athletic event (but not including proposition bets on such collegiate sport or event), or any motor vehicle race, or any portion of any of the foregoing, including but not limited to the individual performance statistics of an athlete or other individual participant in any event or combination of events, or any other 'in-play' wagering with respect to any such sporting event, competition or contest, except 'Sports Betting' does not include Fantasy Sports Contests.

***Ex. A, 2021 Compact**, Part III, Sec. CC.*

104.   On May 17, 2021, the 2021 Compact was modified such that online off-reservation Sports Betting will not be effective before October 15, 2021.  A true and correct copy of the addendum is attached hereto as ***Exhibit D***.

105.   As originally drafted, Part XVIII, Section A of the 2021 Compact also provided the State and the Tribe "agree to engage in good faith negotiations within

thirty-six (36) months after the Effective Date of this Compact to consider an amendment to authorize the Tribe to offer all types of Covered Games online or via mobile devices to players physically located in the State, where such wagers made using a mobile device or online shall be deemed to take place exclusively where received at the location of the servers or other devices used to conduct such wagering activity at a Facility on Indian Lands."

106.   Part XVIII, Section A contemplated the Tribe would be authorized to offer not only Sports Betting, but also slot machines, craps, roulette, raffles and drawings, and any other "Covered Games" online or via mobile devices in the near future.

107.   During the Florida Legislature's special session, there was a swift objection by a number of members regarding statewide online casino gambling under Part XVIII, Section A.  The political backlash was so severe that the Tribe released a letter stating that the State was not obligated to negotiate under Part XVIII, Section A and that the provision was not enforceable against the State.

108.   On May 17, 2021, the 2021 Compact was amended to delete Part XVIII, Section A in its entirety.  The 2021 Compact was also amended to change certain revenue sharing provisions relating to the counties where the reservations are located.

109.   The 2021 Compact also includes provisions regarding "Fantasy Sports Contest," which means a "fantasy or simulation sports game or contest offered by a contest operator or noncommercial contest operator in which a contest participant manages a fantasy or simulation sports team composed of athletes from a professional sports organization" where (1) the prizes and awards are established and known to participants in advance of the contest; (2) winning outcomes reflect the knowledge and skill of the participants; (3) no winning outcome is based on the score, point spread or any performance of any single actual team; and (4) there are no casino graphics displayed. *Ex A, 2021 Compact*, Part III, Sec L.

110.   The Florida Legislature did not take up legislation to regulate and ban others from conducting Fantasy Sports Contests as provided under the 2021 Compact, which described them as "games of skill."   As a result, Fantasy Sports Contests continue to be unregulated in Florida, but the Tribe, while able to conduct Fantasy Sports Contests, will not obtain a monopoly over them (at least for now).

111.   On May 19, 2021, the Florida Legislature ratified the 2021 Compact as amended, passing the Implementing Law.  *See Ex. B, Implementing Law.*

112.   The Implementing Law adopts the definitions in the 2021 Compact and amends § 285.710, Florida Statutes, which was previously enacted to ratify the 2010 Compact, to ratify and approve the "gaming compact between the Seminole Tribe

of Florida and The State of Florida, executed by the Governor and the Tribe on April

23, 2021, as amended on May 17, 2021."

113.   On May 25, 2021, the Implementing Law was approved by Gov.

DeSantis.   The Implementing Law recognizes that the 2021 Compact only

supersedes the 2010 Compact upon becoming effective, and if it is not approved by

the DOI Secretary or invalidated by court action, then the 2010 Compact remains in

effect.  § 285.710(3)(b), Fla. Stat.

114.   The Implementing Law provides in § 285.710(3), Fla. Stat., that it shall

become effective "upon becoming law," which was immediately upon the

Governor's approval on May 25, 2021.  *See also Negron v. State*, 932 So. 2d 1250,

1251 (Fla. 3d DCA 2006).

115.   On information and belief, on or about June 21, 2021, the State and/or

the Tribe submitted the 2021 Compact to the DOI Secretary for approval.

### *The 2021 Compact and Implementing Law Contradict* ###
### *Decades of Federal Legislation and Established Precedent* ###
### *Defining Where a Bet or Wager is Placed* ###

116.   The Implementing Law purports to legalize sports betting in Florida,

but only for purposes of attempting to shoehorn the online Sports Betting provisions

of the 2021 Compact into the requirements of the IGRA.  § 285.710(13)(b), Fla. Stat.

("for the purpose of satisfying the requirement in 25 U.S.C. s. 2710(d)(1)(B) that the

gaming activities authorized under an Indian gaming compact must be permitted in

32

the state for any purpose by any person, organization, or entity," sports betting is "authorized to be conducted by the Tribe pursuant to the [2021 C]ompact . . . when such compact has been approved by the United States Secretary of the Interior, has not been invalidated by court action or change in federal law, and is effective").

117.   Under the 2021 Compact, Sports Betting will occur through the use "of any electronic device connected via the internet, web application or otherwise, including, without limitation, any Patron connected via internet, web application or otherwise of any Qualified Pari-mutuel Permitholder(s) and regardless of the location in Florida at which a Patron uses the same." *See Ex. A, 2021 Compact*, Part III, Sec. CC.2.

118.   Further, the 2021 Compact states:

> [W]agers on Sports Betting and Fantasy Sports Contests made by players physically located within the State using a mobile or other electronic device **shall be deemed to take place exclusively where received at the location of the servers** or other devices used to conduct such wagering activity at a Facility on Indian Lands.

*Ex. A, 2021 Compact*, Part IV, Sec. A (emphasis supplied).

119.   The Implementing Law, copying the language of the 2021 Compact, similarly states, "[w]agers on sports betting, including wagers made by players physically located within the state using a mobile or other electronic device, shall be deemed to be exclusively conducted by the Tribe where the servers or other devices

33

used to conduct such wagering activity on the Tribe's Indian lands are located."
§ 285.710(13)(b)(7), Fla. Stat.

120.   The 2021 Compact and Implementing Law expand sports betting beyond the Tribe's Indian lands and permit sports betting all over the state – subject only to the Tribe's monopoly.

121.   Indeed, persons over the age of twenty-one (21), who are physically present in Florida, but not on the Tribe's Indian lands, may participate in sports betting and "all such wagering **shall be deemed at all times to be exclusively conducted by the Tribe at its Facilities** where the sports book(s), including servers and devices to conduct the same, are located."  *See **Ex. A, 2021 Compact***, Part III, Sec. CC.2 (emphasis supplied).

122.   For example, under the 2021 Compact and the Implementing Law, an individual over the age of twenty-one (21), who places a wager on a sporting event using his mobile device from his couch in Okaloosa, Florida, is "deemed" to have placed the bet over 600 miles away at the Seminole Hard Rock Hotel & Casino-Hollywood, simply because the Tribe's servers are located there.

123.   The 2021 Compact further allows online off-reservation sports betting to occur at pari-mutuel facilities to be selected by the Tribe.[15] ***Ex. A, 2021 Compact***,

---

[15]   The 2021 Compact allows the Tribe to enter into marketing and revenue-sharing agreements with pari-mutuels who are referred to as "Qualified Pari-mutuel Permitholder(s)."   The Qualified Pari-mutuel Permitholder is allowed to perform

Part III, Sec. CC (d) ("all such wagering is conducted exclusively at one or more of the Tribal Facilities…even if Qualified Pari-mutuel Permitholders market the Tribe's sports book by providing dedicated areas within *their facilities* wherein Patrons may access or use electronic devices to place wagers via the Internet, web applications, or otherwise to the Tribe's sports book").  This arrangement has been described as a "hub and spoke", whereby the Tribe is the hub of the betting operation, and the participating pari-mutuels are the spokes.  *See* https://floridapolitics.com/archives/430065-senate-passes-fantasy-sports-regulations-over-draftkings-and-fanduels-fears/ (Rep. Sam Garrison stating "There's a legitimate question and legal question as to whether or not the sports gaming, with the hub-and-spoke model as contemplated in the compact, triggers Amendment 3") (last visited July 1, 2021).

124.   In fact, several legislators and others have questioned the legality and/or constitutionality associated with providing a hub-and-spoke off-reservation online gambling model:

> (1)   "It is not legal and permissible to have tribal gambling exceed the boundaries of tribal land."  - John Sowinski, president of No

---

"wagering undertaken through the use of electronic devices that will utilize the digital sports book(s) provided by the Tribe, and that use a brand of the Qualified Pari-mutuel Permitholder(s)."  *See Ex. A, 2021 Compact*, Part III, Sec. CC.3(a).

Casinos, an organization that opposes gambling advocated for the adoption of Amendment 3. Forrest Saunders, *Florida Poised to Approve New Gaming Rules When Lawmakers Return Next Week*, WPTV (May 14, 2021) https://www.wptv.com/news/state/florida-poised-to-approve-new-gaming-rules-when-lawmakers-return-next-week (last visited July 1, 2021).

(2)    "We're going to allow the Seminole Tribe to offer sports betting where you can be sitting in your bathtub or sitting on your couch, thinking about a football game and you can make a wager, regardless of where you physically are, on your cellphone." - Rep. Randy Fine, R-Palm Bay, the House Chair of the Select Committee on Gaming. William P., *House Legislators Approve Deal that Grants Seminole Tribe Expanded Grambling Rights in Florida–Includes Roulette, Craps, and Sports*, Florida Insider (May 19, 2021) https://floridainsider.com/business/house-legislators-approve-deal-that-grants-seminole-tribe-expanded-gambling-rights-in-florida-includes-roulette-craps-and-sports/ (last visited July 1, 2021).

(3)    "There's a legitimate question and legal question as to whether or not the sports gaming, with the hub-and-spoke model as contemplated in the compact," is constitutional. "It's an open legal

question.  Period."  "There is no black and white answer whether the hub and spoke model is going to be permitted or not.  As we've said from Day One, and as the parties have contemplated, [whether the hub and spoke model is constitutional] is an open question."  - Rep. Sam Garrison.  Ryan Nicol, *Dan Gerber, Philip Levine Argue Voters Should Have a Say in New Gaming Deal*, Florida Politics (May 17, 2021) https://floridapolitics.com/archives/430075-gelber-levine-voters-gaming-deal/ (last visited July 1, 2021); Mary Ellen Klas & Ana Ceballos, *Florida Legalizes Sports Betting, Hard Rock to Add Roulette, Craps*, Tampa Bay Times (May 19, 2021) https://www.tampabay.com/news/florida-politics/2021/05/19/florida-legalizes-sports-betting-but-hurdles-remain/ (last visited July 1, 2021).

(4)     "You're going to get into a legal question about where the servers are located and where does the bet take place?  You're going to have folks that argue that the bet actually takes place on tribal land, because that's where the servers are located.  But then the other side is going to say, well, you know, the offer takes place…where the bet was placed." - Sen. Jason Brodeur.  Jim Rosica, *High Stakes: Is Florida Ready for Smartphone-Based Online Sports Betting?*, Tallahassee Democrat (May                                                           14,                                                           2021)

https://www.tallahassee.com/story/news/local/state/2021/05/14/florida -legal-sports-betting-seminole-tribe-compact-desantis-gambling-deal- special-session/4988655001/ (last visited July 1, 2021).

(5) "[T]he Department [of Interior] will have to look at whether the gaming – when a bet is placed outside Indian lands and the server is on Indian land, whether that satisfies the IGRA requirement that it's gaming on Indian lands. And I think there is language in [the Desert Rose] opinion that indicate that this is going to be a difficult decision for the department . . ." George Skibine, former Deputy Assistant Secretary of Indian Affairs at Department of the Interior. House Select Committee on Gaming, May 18, 2021. https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=7311

125. The Governor's office itself also acknowledged that the legality of online betting was an open question: "**The main concern is whether online gaming is considered gambling 'in tribal lands**.'" *See* 2021 Compact, Governor's Office Materials: FAQ, (last visited July 1, 2021). https://www.myfloridahouse.gov/api/document/house?Leaf=HouseContent/Lists/L egislatorUResources/Attachments/66/2021.05.12%20Compact%20FAQs.pdf

126. Even Jim Allen, Chairman of Hard Rock International (the Tribe's casino operation) has acknowledged the possibility that the online sports betting

portions of the 2021 Compact will be struck down: "If we were not to prevail in a state or federal court for the purpose of sports betting being authorized, the Tribe has already stated it will honor the revenue share from our land-based casinos at a minimum." https://floridapolitics.com/archives/430058-house-panel-approves-gaming-compact-amid-open-legal-question/ (last visited July 1, 2021).

127.   Plaintiffs recognize that the State could compact with the Tribe to permit in person sports betting by patrons physically *on its reservations*.  However, the State cannot circumvent its own laws or federal law in an attempt to legalize off-reservation sports betting for the Tribe only.

128.   Notably, the 2021 Compact itself contemplates that the courts may in fact invalidate provisions of the compact, and specifically the off-reservation sports betting provisions, by including the following severability provisions:

> Each provision, section, and subsection of this Compact shall stand separate and independent of every other provision, section, or subsection, and shall be interpreted to ensure compliance with IGRA.  In the event that a federal district court in Florida or other court of competent jurisdiction shall find any provision, sections, and subsections of this Compact to be invalid, the remaining provisions, sections and subsections of this Compact shall remain in full force and effect.

***

> **If at any time the Tribe is not legally permitted to offer Sports Betting as described in this Compact, including to Patrons physically located in the State but not on Indian Lands, then the Compact will not**

39

> **become null and void**, but the Tribe will be relieved of
> its obligation to pay the full Guaranteed Minimum
> Compact Term Payment…

*Ex. A, 2021 Compact*, Part XIV, Sec. A (emphasis supplied).

129.    While the 2021 Compact asserts that operation of online off-reservation sports betting will be in "strict compliance" with the provisions of the federal Wire Act, 18 U.S.C. § 1084, and all other applicable federal laws with respect to the conduct of sports betting, as well as the IGRA, that is just not the case. *See Ex. A, 2021 Compact*, Part VII, Sec. A.1(c) and Part XIV, Sec. D.

### *The 2021 Compact and the Implementing Law, Granting the Tribe Exclusive Operation of Online Sports Betting Throughout the Entire State of Florida, Injures Pari-mutuel Facilities*

130.    The pari-mutuel business model allows pari-mutuels to profit by offering pari-mutuel betting pools to the public and collecting a percentage of the money collected from bettors.  Pari-mutuel betting is a gambling framework, utilized primarily in horse racing, jai alai, and any authorized event, where the competitors finish in a ranked order, from first to last.  For example, bettors will bet on horses to "Win," "Place" or "Show"—the first three horses across the finish line.  The payout is determined once the betting event (the race or round) commences, which is when the betting pool is closed.  The sportsbook or racetrack where the wager is placed collects a percentage from the pool, called the vigor, in exchange for offering the wager.  The higher the number of patrons placing wagers in the betting pool, the

greater the vigor and; thus, the greater the net revenue to the pari-mutuel. In Miami-Dade County, pari-mutuels like the Magic City Casino can also offer Las Vegas-style slot machines. And all pari-mutuels in Florida can obtain a card room permit. Patrons must visit the pari-mutuels in order to play slots or poker.

131.   The 2021 Compact and Implementing Law prohibit pari-mutuels and others from offering sports betting unless they enter into an agreement with the Tribe.

132.   While the 2021 Compact provides that "Within three (3) months of the effective date, the Tribe shall negotiate in good faith with any and all willing Qualified Pari-mutuel Permitholders to enter into written contracts as provided in [the] Section," in reality, the Tribe has complete discretion with respect to these contracts.  Aside from certain specific conditions, the Tribe exclusively determines the terms and conditions of the contracts.  The only consequence of not entering into at least three (3) contracts with Qualified Pari-Mutuel Permitholders under the 2021 Compact is that the Tribe will pay the state an additional 2% of its "Net Win" from Sports Betting.  Once it enters into contracts with the first three pari-mutuels, again, it is up to the Tribe to negotiate in good faith with other willing pari-mutuels.  *See Ex. A, 2021 Compact*, Part III, Sec. CC.3-4.

133.   Under the 2021 Compact, bettors can either place sports bets directly with the Tribe from their phones, computers and other mobile devices, or they can

place such wagers either in-person or online via a licensed pari-mutuel authorized by the Tribe to provide marketing services on its behalf.  *See **Ex. A, 2021 Compact***, Part III, Sec CC.2-3.

134.   As State Representative Sam Garrison explained, the 2021 Compact creates a "hub-and-spoke model."[16]  The Tribe is at the center of the hub and, at its option, one or more pari-mutuels not located on Indian lands are at the spokes of the sports betting wheel.  The Tribe has the exclusive power to decide whether it will enter into such arrangements.

135.   Indeed, the Tribe has already begun soliciting potential spokes for its off-reservation online sports betting.  On June 24, 2021, the Tribe, through Jim Allen, Chairman of Hard Rock International and CEO of Seminole Gaming, reached out to Magic City "to initiate discussions…regarding the proposed sports book offering in the state" pursuant to the 2021 Compact (the "Allen Letter").  A true and correct copy of the Allen Letter is attached hereto as ***Exhibit E***.  The purpose of the Tribe's letter is to have Southwest Pari-mutuels, and presumably other pari-mutuel facilities, respond to the Tribe's request for information regarding the their facilities and "proposed framework for branding and marketing the sportsbook."  Following receipt of the pari-mutuels responses to the request for information, the Tribe will

---

[16]   https://www.bradenton.com/news/politics-government/state-politics/article251528698.html (last visited July 1, 2021).

schedule meetings with interested pari-mutuels to discuss a proposed marketing agreement and sports betting offering.  ***Ex. E, Allen Letter.***

136.   As the 2021 Compact and the Allen Letter make clear, the only way a pari-mutuel can participate in online off-reservation sports betting is to be one of the spokes on terms and conditions dictated exclusively by the Tribe.  In addition to placing bets at kiosks at pari-mutuel facilities throughout Florida, the bettors can also place bets from the comfort of their living room or mobile device.  The role of the pari-mutuel with respect to online betting is limited to solely providing the "skin" for the mobile or web gaming application.[17]  As a result of these provisions, pari-mutuels that are unable to, or choose not to, enter into a marketing agreement with the Tribe are completely shut out of any opportunity to offer sports betting. Accordingly, the pari-mutuels will not only lose the walk-in traffic on which their business models are based, which will ultimately affect their revenue from slot machines, card rooms, and pari-mutuel wagering, as well as the ancillary

---

[17]     Under the 2021 Compact, the Qualified Pari-mutuel Permitholder(s) will be contractually responsible for performing "marketing or similar services for the Tribe's sports book(s) related to, for and including such wagering undertaken through the use of electronic devices," which includes the "development or procurement of customizable web or mobile assets for marketing services."  ***Ex. A, 2021 Compact***, Part III, Sec. CC.3.  In essence, the pari-mutuels procure, develop, and advertise the web application that patrons will use to place sports betting wagers with the Tribe.

entertainment and dining options offered to patrons of their facilities--but they are also being denied the opportunity to compete on a level playing field with the Tribe.

137.   While under the IGRA, a state legitimately may grant "exclusivity" to an Indian tribe in exchange for a share to the Tribe's gaming revenue, the IGRA does not authorize any compact that grants tribes the right to conduct gambling outside tribal lands, much less a monopoly on gaming outside tribal lands.

138.   The 2021 Compact's and Implementing Law's unauthorized purported legalization of online, off-reservation sports betting, will have an adverse effect on Southwest Pari-mutuels' revenues, due to the expected cannibalization of in-person betting at pari-mutuel facilities once the 2021 Compact is approved and online sports betting becomes available through the Tribe's exclusive arrangements.

139.   This is not ameliorated by the pre-ordained arrangements in the 2021 Compact that require the Tribe receive 40% of the Net Win of all sports bets placed through the hub-and-spoke arrangement with willing pari-mutuels which the Tribe permits to participate in its monopoly.

140.   "Home casinos," as contemplated by the 2021 Compact, will significantly diminish revenue at Southwest Pari-mutuels' brick and mortar locations because individuals in Florida can now gamble from the comfort of their homes, which will significantly, it not completely, impair Southwest Pari-mutuels' ability to compete with the Tribe.

44

141.   The Florida gaming industry, at large, will also suffer irreparable injury due to a substantial decline in revenues, as the Tribe will be permitted to operate online off-reservation sports betting without having to require patrons be physically present on Indian lands.

142.   Southwest Pari-mutuels, as direct competitors of the Tribe, will lose millions in revenue if the *ultra vires* online, off-reservation sports betting of the 2021 Compact and the Implementing Law are not enjoined from implementation.

143.   For this reason, the off-reservation sports betting provisions of the 2021 Gaming Compact and the Implementing Law should be declared unlawful and the Court should enjoin Governor DeSantis from cooperating with the Tribe to secure approval of the 2021 Compact as written, and the DBPR Secretary from implementing the online provisions of the 2021 Compact as directed in the Implementing Law.

144.   All conditions precedent to the bringing of this action, if any, have occurred, have been waived or are excused.

145.   Southwest Pari-mutuels have retained the undersigned counsel and have agreed to pay the firm a reasonable fee for its services.  Southwest Pari-mutuels have incurred costs in bringing this action.

## CLAIMS FOR RELIEF

### COUNT I
### DECLARATORY AND INJUNCTIVE RELIEF (28 U.S.C. §§ 2201, 2202)
#### *Ultra Vires Under the Indian Gaming Regulatory Act*

146.   Southwest Pari-mutuels re-allege and incorporate the allegations in paragraphs 1 through 146 as if fully set forth herein.

147.   This is an action brought pursuant to 28 U.S.C. §§ 2201 and 2202 and under this Court's inherent equitable powers for declaratory and injunctive relief.

148.   This Court has the inherent authority to hear suits in equity where state laws violate or are preempted by federal law.

149.   As economic competitors of the Tribe, Southwest Pari-mutuels have standing to bring this claim because there is a controversy over whether or not the IGRA authorizes online Class III gaming, including sports betting, by persons who are not physically present on Indian lands.  Implementation of the off-reservation and online sports betting provisions of the 2021 Compact pursuant to the Implementing Law will place Southwest Pari-mutuels at a competitive disadvantage with the Tribe, and therefore, a finding by this Court that such provisions are *ultra vires* will operate to the economic advantage of Southwest Pari-mutuels.

150.   Congress designed the IGRA "to facilitate on-reservation gaming." *See Connecticut v. U.S. DOI*, 344 F. Supp. 3d 279, 302 (D.D.C. 2018).  The IGRA does not authorize tribal gaming outside of Indian lands.  *See* 25 U.S.C. § 2710(d)(l); *see*

46

*also* **Ex. C, NIGC Letters**; Amicus Brief of the United States, 1999 WL 33622333 at 4-5; Brief for Amici Curiae in Support of AT&T Corporation and Affirmance, 1999 WL 33622330 at 4-5 (9th Cir. June 22, 1999, Case No. 99-35088) (filed by the Florida and Minnesota attorneys general).

151.   The State of Florida itself has taken the position that off-reservation betting is unauthorized under the IGRA because a bet is placed *both* where the bettor is physically located and where the bet is accepted:

> The "on Indian lands" requirement of IGRA clearly mandates that any Indian gaming activity, including a consumer's play or participation in the game, physically take place on tribal land.  Gaming activity necessarily includes the player's placing of the wager or other participation in the game.  *See, e.g.*, Black's Law Dictionary, 679 (6th ed. 1990) (definition of "gambling" includes "[m]aking a bet"); Webster's New International Dictionary, 932 (3rd ed. 1964) (definition of "gambling" includes the act or practice of betting).  In the context of a lottery, for the gaming activity to be conducted, participants place their wager by purchasing lottery tickets.  Under the NIL [National Indian Lottery] concept, persons physically present in any of the *amici* states, not on the Coeur d'Alene reservation, would be wagering on the NIL.  **The existence of a phone bank and a centralized computer system on the Coeur d'Alene reservation does not change the uncontested fact that the person making the wager is located outside of Idaho, and clearly not on the Coeur d'Alene reservation.  As a consequence, because the wager is placed off the reservation, the gaming activity is not conducted "on Indian lands" as plainly required by IGRA**.

Brief of *Amici Curiae* in Support of AT&T Corporation and Affirmance, *Couer d'Alene Tribe v. AT&T Corporation*, 1999 WL 33622330 at 4 (9th Cir. June 20, 1999, Case No. 99-35088) (emphasis supplied).

152.   "Indian lands" means Indian reservations and lands held in trust by the United States for the benefit of any federally-recognized Indian tribe.  *See* 25 U.S.C. § 2703(4).

153.   The 2021 Compact and the Implementing Law provide that online, off-reservation sports betting "shall be deemed at all times to be exclusively conducted by the Tribe at its Facilities where the sports book(s), including servers and devices to conduct the same, are located, including any such wagering undertaken by a Patron **physically located in the State but not on Indian Lands** using an electronic device connected via the internet, web application or otherwise, including, without limitation, any Patron connected via the internet, web application or otherwise of any Qualified Pari-mutuel Permitholder(s) and **regardless of the location in Florida at which a Patron uses the same**."  *See Ex. A, 2021 Compact,* Part III, Sec. CC.2 (emphasis supplied).

154.   The IGRA does not authorize a tribe to offer online gaming to patrons located off Indian lands in jurisdictions where gaming is otherwise illegal despite the servers' accepting the bets being located on Indian lands.  *Desert Rose*, 898 F.3d at 968 (holding the tribe could not operate an online bingo site despite the server

being on Indian lands as "the patrons [were] engaging in 'gaming activity' by initiating a bet or wager in California and off Indian lands . . . [thus,] some of 'gaming activity' associated with [Dessert Rose Bingo] d[id] not occur on Indian lands").

155.   A wager placed off Indian lands cannot be "deemed" to be placed on Indian lands simply because of the location of the server. *Id.* at 968 ("IGRA protects gaming activity conducted on Indian lands.  However, the patrons' act of placing a bet or wager on a game of DRB while located in California constitutes a gaming activity that is not located on Indian lands.").

156.   Based on the plain language of the IGRA, the 2021 Compact and the Implementing Law do not comply with the IGRA's "Indian lands" requirement, and contradict the meaning of "Indian lands" under the IGRA.

157.   Because the portions of the 2021 Compact and the Implementing Law that purport to authorize any off-reservation sports betting fail to comply with the IGRA's "on Indian lands" requirement, these portions of the 2021 Compact and the Implementing Law are unauthorized under the IGRA and are thus *ultra vires*.  25 U.S.C. §§ 2703(4); 2710(d).

158.   Southwest Pari-mutuels have raised doubts as to the validity of the off-reservation and online sports betting provisions of the 2021 Compact and the Implementing Law as well as the authority of Gov. DeSantis to execute the 2021

Compact, the legislature's authority to ratify the compact as drafted and the DBPR Secretary's authority to implement these provisions.  Plaintiffs are entitled to have such doubt removed.

159.   Effective October 1, 2021, the Implementing Law will make it a third-degree felony (currently, it is a second degree misdemeanor) to engage in any form of sports betting.  Senate Bill 8-A, amending § 849.14, Fla. Stat.  However, select pari-mutuels chosen by the Tribe will be able to engage in this otherwise illegal activity only if they contract with the Tribe for the privilege.

160.   Under the 2021 Compact and Implementing Law, selected pari-mutuels will serve as the spokes in the "hub-and-spoke model" of off-reservation sports betting, where the Tribe serves as the hub.

161.   In addition to placing bets at designated pari-mutuel facilities throughout Florida, bettors can also place bets from the comfort of their living room on a computer or even from a car via a mobile device.  With respect to the online sports betting, the expected role of the pari-mutuels is to provide the "skin" for the mobile or web gaming application.

162.   Under the Implementing Law, pari-mutuels that are unable to or choose not to enter into a marketing agreement with the Tribe are completely shut out of any opportunity to offer sports betting and thus will be unable to compensate for the loss of revenue from patrons diverted by online sports betting.

163.   Specifically, Plaintiffs Southwest Pari-mutuels request that this Court declare the off-reservation sports betting provisions in the 2021 Compact and the Implementing Law are unauthorized under the IGRA because a wager placed off Indian lands cannot be deemed to be placed on Indian lands, notwithstanding the fanciful and contradictory definition purported to be created under the 2021 Compact and Implementing Law.

164.   There is a present and ascertainable state of facts of a present case or controversy between the parties within the jurisdiction of this Court that justifies the declaratory relief sought by Southwest Pari-mutuels.

165.   There is a bona fide, actual, present, and practical need for this declaration.  The harm to Southwest Pari-mutuels as a direct result of the actions and threatened actions of Defendants is sufficiently real and imminent to warrant the issuance of a conclusive declaratory judgment and prospective injunctive relief.

166.   Defendants have an actual, present, adverse, and antagonistic interest in the subject matter of the declaratory relief sought by Southwest Pari-mutuels, and all antagonistic and adverse interest over whom this Court is able to exercise jurisdiction are before this Court by proper process.[18]

---

[18]    Plaintiffs would have added the Tribe as a party defendant; however, Indian tribes generally enjoy sovereign immunity from unconsented suit.  *See Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014) ("Among the core aspects of sovereignty that tribes possess—subject, again, to congressional action—is the 'common-law immunity from suit traditionally enjoyed by sovereign powers.'").

167.  The declaration sought is not merely the giving of legal advice to answer questions propounded from curiosity.

**WHEREFORE,** Plaintiffs West Flagler Associates, Ltd., and Bonita-Fort Myers Corporation respectfully request that this Court, pursuant to 28 U.S.C. §§ 2201 and 2202 and its inherent equitable powers, (1) enter a declaratory judgment declaring that the off-reservation sports betting provisions of the 2021 Compact are unauthorized under the IGRA and are thus *ultra vires*, because they purport to authorize Class III gaming outside of Indian lands; (2) enter a declaratory judgment declaring that the off-reservation sports betting provisions of the Implementing Law are unauthorized under the IGRA and are thus *ultra vires*, because they purport to authorize Class III gaming outside of Indian lands*;* (3) enjoin Defendant Governor Ronald Dion DeSantis from cooperating with the Tribe to secure approval of the 2021 Compact in its current form as mandated by the Implementing Law; (4) enjoin Defendant Secretary Julie Imanuel Brown from implementing the provisions of Section 285.710, Florida Statutes, with respect to the off-reservation sports betting provisions of the 2021 Compact; and (5) award costs to Plaintiffs together with such other and further relief as the Court deems just and equitable.

---

Plaintiffs do not object to the Tribe's intervention in this action as a party defendant–and its concomitant waiver of tribal sovereign immunity–should it so choose.

## COUNT II
## DECLARATORY AND INJUNCTIVE RELIEF (28 U.S.C. §§ 2201, 2202)
### *Ultra Vires Under the Wire Act*

168.   Southwest Pari-mutuels re-allege and incorporate the allegations in paragraphs 1 through 146 as if fully set forth herein.

169.   This is an action brought pursuant to 28 U.S.C. §§ 2201 and 2202 and under this Court's inherent equitable powers for declaratory and injunctive relief.

170.   This Court has the inherent authority to hear actions in equity where state laws violate or are preempted by federal law.

171.   As economic competitors of the Tribe, Southwest Pari-mutuels have standing to bring this claim because there is a controversy over whether or not the Wire Act prohibits online sports betting by persons who are not physically present on Indian lands when the bet is placed, but are in Florida, where sports betting is illegal.  Implementation of the online Sports Betting provisions of the 2021 Compact pursuant to the Implementing Law will place Southwest Florida Pari-mutuels at a competitive disadvantage to the Tribe, and therefore, a finding by this Court that such provisions are *ultra vires* will operate to the economic advantage of Southwest Pari-mutuels.

172.   The Wire Act makes it illegal for:

> Whoever being engaged in the business of betting or wagering knowingly **uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting**

> **in the bets or wagers on any sporting event or contest**, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers…

*See* 18 § U.S.C. 1084(a) (emphasis supplied).

173.   The Tribe is engaged in the business of betting or wagering.

174.   The 2021 Compact authorizes the Tribe to conduct off-reservation sports betting through the use of an "electronic device connected via the internet, web application or otherwise, including, without limitation, any Patron connected via the internet, web application or otherwise of any Qualified Pari-mutuel Permitholder(s) and **regardless of the location in Florida at which a Patron uses the same**." ***Ex. A, 2021 Compact***, Part III, Sec. CC.2 (emphasis supplied).  Unless enjoined, the State of Florida has purported to authorize the Tribe and pari-mutuels that contract with the Tribe to knowingly use a "wire communication facility" in interstate commerce for bets and wagers on sporting events or transmission of information with respect thereto.

175.   Usage of the Internet, mobile devices, or web applications for placing sports bets from outside the Tribe's reservations uses "a wire communication facility in interstate commerce," notwithstanding the fact that the bettor is located in Florida, where sports betting remains illegal, and the servers are on the Tribe's reservations.

176.   Internet and cellular communications initiating or paying bets placed from anywhere in Florida outside the Tribe's reservations use the facilities of interstate commerce in order to communicate with the Tribe's on-reservation servers.

177.   The fact that the bettor is in the same state as the server does not render the "wire communication facility" an *intrastate* communication when the server is located on Indian lands but the bettor is not.

178.   The Tribe is not a "State" under the Wire Act.  18 U.S.C. §1084(e) ("the term 'State' means a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or a commonwealth, territory or possession of the United States").

179.   The Tribe is not a "foreign country" under the Wire Act.

180.   The Tribe is a "federally-recognized tribal government possessing sovereign powers and rights of self-government."  ***Ex. A, 2021 Compact***, Part II, Sec. A; *see also* https://www.semtribe.com/stof/history/introduction ("We [the Tribe] are a sovereign government with our own schools, police, and courts.").

181.   The 2021 Compact and the Implementing Law, by authorizing online, off-reservation sports betting, are permitting Internet and mobile gambling that is unlawful under the Wire Act because sports gambling is unlawful under Florida law.

182.   Thus, the 2021 Compact and the Implementing Law impermissibly conflict with and thereby violate the Wire Act, 18 U.S.C. § 1084(a), rendering the execution of the 2021 Compact and adoption of the Implementing Law *ultra vires* with respect to the online sports betting provisions.

183.   The 2021 Compact contradicts decades of federal law and settled precedent by stating that it is compliant with the Wire Act.  *See **Ex. A, 2021 Compact***, Part VII, A.1(c).

184.    Southwest Pari-mutuels have raised doubts as to the validity of the sports betting portions of the 2021 Compact and the Implementing Law and the authority of Gov. DeSantis to execute the 2021 Compact under these circumstances and of the State to implement these provisions.

185.   Pari-mutuels are the spokes in the "hub-and-spoke model" of online, off-reservation sports betting where the Tribe is at the hub.  In addition to placing bets at kiosks at pari-mutuel facilities throughout Florida, bettors can also place bets from the comfort of their living room, from their computer or mobile device, or from anywhere with a mobile phone.  In such instances, the role of the pari-mutuels who contract with the Tribe is to provide the "skin" for the mobile or web gaming application.

186.   As a result of these provisions, pari-mutuels that are unable to, or choose not to, enter into a marketing agreement with the Tribe will be unable to compensate for the loss of revenue from patrons diverted by online sports betting.

187.   Plaintiffs are entitled to have doubts about the *ultra vires* nature of the online sports betting provisions of the 2021 Compact and Implementing Law removed.

188.   Specifically, Southwest Pari-mutuels request that this Court declare that the online, off-reservation sports betting provisions in the 2021 Compact and the Implementing Law violate the Wire Act because they permit an individual to place an off-reservation sports bet or wager by a means which involve wire communications in interstate commerce through the Internet, mobile devices or otherwise, where such bet is otherwise unlawful under the laws of the State of Florida.

189.   There is a present and ascertainable state of facts of a present case or controversy between the parties within the jurisdiction of this Court that justifies the declaratory relief sought by Southwest Pari-mutuels.  The harm to Southwest Pari-mutuels as a direct result of the actions and threatened actions of Defendants is sufficiently real and imminent to warrant the issuance of a conclusive declaratory judgment and prospective injunctive relief.

190.   There is a bona fide, actual, present, and practical need for this declaration.

191.   Defendants have an actual, present, adverse, and antagonistic interest in the subject matter of the declaratory relief sought by Southwest Pari-mutuels, and all antagonistic and adverse interest over whom this Court is able to exercise jurisdiction are before this Court by proper process.[19]

192.   The declaration sought is not merely the giving of legal advice to answer questions propounded from curiosity.

**WHEREFORE**, Plaintiffs West Flagler Associates, Ltd., and Bonita-Fort Myers Corporation respectfully request that this Court, pursuant to 28 U.S.C. §§ 2201 and 2202 and its inherent equitable powers, (1) enter a declaratory judgment declaring the online, off-reservation sports betting provisions of the 2021 Compact violate the Wire Act and are thus *ultra vires*, because they permit an individual in Florida located outside the Tribe's reservation to place a sports bet or wager by a means of a wire communication facility for transmission in interstate commerce; (2) enter a declaratory judgment declaring the online, off-reservation sports betting provisions of the Implementing Law violate the Wire Act and are thus *ultra vires*, because they permit an individual in Florida located outside the Tribe's reservation to place a sports bet or wager by a means of a wire

---

[19]   *See supra* n. 18.

communication facility for transmission in interstate commerce; (3) enjoin Governor Ronald Dion DeSantis from cooperating with the Tribe to secure approval of the 2021 Compact in its current form as mandated by the Implementing Law; (4) enjoin the Defendant Secretary Julie Imanuel Brown from implementing the provisions of Section 285.710, Florida Statutes, with respect to online sports betting or use of any communications facility for transmission in interstate commerce from anywhere outside the Tribe's reservations; and (5) award costs to Plaintiffs together with such other and further relief as the Court deems just and equitable.

## COUNT III
## DECLARATORY AND INJUNCTIVE RELIEF (28 U.S.C. §§ 2201, 2202)
### *Ultra Vires under the Unlawful Internet Gambling Enforcement Act*

193.    Southwest Pari-mutuels re-allege and incorporate the allegations in paragraphs 1 through 146 as if fully set forth herein.

194.    This is an action brought pursuant to 28 U.S.C. §§ 2201 and 2202 for declaratory and injunctive relief under this Court's inherent equitable powers.

195.    This Court has the inherent authority to hear suits in equity where state laws violate or are preempted by federal law.

196.    As an economic competitor of the Tribe, Southwest Pari-mutuels have standing to bring this claim because there is a controversy over whether or not the UIGEA prohibits financial transactions associated with the placing or receiving of a

sports bet through the Internet where online gambling is illegal in Florida, where the bet is placed.  Implementation of the online sports betting provisions of the 2021 Compact pursuant to the Implementing Law will place Southwest Florida Pari-mutuels at a competitive disadvantage to the Tribe, and therefore, a finding by this Court that such provisions are *ultra vires* will operate to the economic advantage of Southwest Pari-mutuels.

197.   Unlawful Internet gambling occurs when an individual places or receives a "bet or wager by any means which involves the use, at least in part, of the Internet where such bet or wager is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made."  31 U.S.C. § 5362(10).

198.   The 2021 Compact and the Implementing Law provide that online, off-reservation sports betting "shall be deemed at all times to be exclusively conducted by the Tribe at its Facilities where the sports book(s), including servers and devices to conduct the same, are located, including any such wagering undertaken by a Patron **physically located in the State but not on Indian Lands** using an electronic device connected via the internet, web application or otherwise, including, without limitation, any Patron connected via the internet, web application or otherwise of any Qualified Pari-mutuel Permitholder(s) and **regardless of the location in**

Florida at which a Patron uses the same." ***Ex. A, 2021 Compact***, Part III, Sec.

CC.2 (emphasis supplied); § 285.710(13)(b)(7), Fla. Stat.

199.   The 2021 Compact further provides in part:  "wagers on Sports Betting

. . . made by players physically located within the State using a mobile or other

electronic device **shall be deemed to take place exclusively where received at the**

**location of the servers** or other devices used to conduct such wagering activity at a

Facility on Indian Lands." ***Ex. A, 2021 Compact***, Part IV, Sec. A (emphasis

supplied).

200.   The UIGEA makes illegal certain financial transactions associated with

gaming on Indian lands facilitated by the Internet when the wager is being placed

outside the reservation in a state whether the wager is otherwise illegal. *Desert Rose*,

898 F.3d at 968.

201.   In *Desert Rose*, the Ninth Circuit Court of Appeals found that "a

patrons' act of placing a bet or wager over the internet while located in a jurisdiction

where those bets or wagers is illegal" makes a tribe's decision to accept financial

payments associated with those bets or wagers a violation of the UIGEA despite the

fact that the tribe's servers were located on Indian lands.  898 F.3d at 968-69.  A

wager placed off Indian lands cannot be considered made on Indian lands simply

because of the location of the server. *Id.* at 968.

202.   The provisions of the 2021 Compact and Implementing Law purporting to redefine where the bet is placed, by deeming the bet "to be exclusively conducted by the Tribe at its Facilities where the sports book(s), including servers and devices to conduct the same, are located" contradict decades of well-established law that holds a bet or wager is made *both* at the location where the bettor is located when the bet is made and where the bet is accepted.  *See* Amicus Brief of the United States, 1999 WL 33622333 at *4 ("Gaming activity necessarily includes the player's placing of the wager or other participation in the game . . . persons physically present in any of the *amici* states, not on the Coeur d'Alene reservation does not change the uncontested fact that person making the wager is located outside of Idaho, and clearly not on the Coeur d'Alene reservation."); Brief of *Amici Curiae*, 1999 WL 33622330 at 4 ( "[t]he existence of a phone bank and a centralized computer system on the Coeur D'Alene reservation does not change the uncontested fact that the person making the wager is located outside of Idaho, and clearly not on the Coeur D'Alene reservation"); *see also* **Ex. C, NIGC Letters**.

203. It is undisputed the 2021 Compact and Implementing Law are authorizing bets to be made from outside Indian lands in Florida, notwithstanding the fact that sports betting is and will remain illegal otherwise unless the State's voters approve an amendment to the state constitution authorizing sports betting.

204.   Online gambling, as well as sports betting, is illegal in Florida and will remain illegal unless the State's voters approve an amendment to the state constitution authorizing online gambling.

205.   Only gambling and wagering expressly authorized by law is legal in the State of Florida.  *See* § 849.01, Fla. Stat., § 849.08, Fla. Stat., § 849.26, Fla. Stat.

206.   Because Florida has not legalized sports betting or online gambling generally throughout the state, it cannot authorize a person to place a sports bet remotely with the Tribe under the auspices of the 2021 Compact, because a bet or wager has to be legal both where the bet is initiated and where it is received.

207.   The 2021 Compact and the Implementing Law violate the UIGEA in at least three ways:

(a)   A "[p]atron physically located in the State but not on Indian Lands using an electronic device connected via the internet, web application or otherwise" would be initiating a bet where such bet is unlawful under Florida law;

(b)   The 2021 Compact and Implementing Law purport to authorize the Tribe and all those in the financial chain of the transaction to knowingly accept financial payments from unlawful online gambling by accepting bets from individuals in Florida who are not physically present on Indian lands when the bet is placed; and

(c)     A wager made by a patron outside the Tribe's reservation via the Internet to a server located on the Tribe's reservation is not "made exclusively within the Indian lands of a single Indian tribe" or "made exclusively within a single State."

208.   Because online sports betting is illegal under the Wire Act and Florida gambling law, it is also unlawful under the UIGEA.

209.   According to their express terms, the online sports betting provisions of the 2021 Compact and the Implementing Law authorize unlawful online gambling, violate the UIGEA and are thus *ultra vires*.  *See* 31 U.S.C. §§ 5363; 5362.

210.   Southwest Pari-mutuels have raised doubts as to the legality of these provisions of the 2021 Compact and the Implementing Law.  Pari-mutuels are the spokes in the "hub-and-spoke model" of online off-reservation sports betting where the Tribe is at the hub.  In addition to placing bets at kiosks at pari-mutuel facilities throughout Florida that communicate online to the Tribe's servers, bettors can also place bets via the Internet from a computer in the comfort of their living room or from their mobile device anywhere in the state without ever entering the Tribe's reservation.  The role of the pari-mutuels with respect to online sports betting is to provide the "skin" for the mobile or web gaming application.

211.   As a result of these provisions, pari-mutuels that are unable to or choose not to enter into a marketing agreement with the Tribe will be unable to compensate for the loss of revenue from in person patrons diverted by online sports betting.

212.   Plaintiffs are entitled to have doubts about the *ultra vires* nature of the sports betting provisions of the 2021 Compact and Implementing Law removed.

213.   Specifically, Southwest Pari-mutuels request this Court declare that the online, off-reservation sports betting provisions in the 2021 Compact and the Implementing law violate the UIGEA and are thus *ultra vires* because they permit an individual to place a sports bet or wager by a means which involves the use of the Internet where such bet is otherwise unlawful under the laws of the State of Florida.

214.   There is a present and ascertainable state of facts of a present case or controversy between the parties within the jurisdiction of this Court that justifies the declaratory relief sought by Southwest Pari-mutuels.  The harm to Southwest Pari-mutuels as a direct result of the actions and threatened actions of Defendants is sufficiently real and imminent to warrant the issuance of a conclusive declaratory judgment and prospective injunctive relief.

215.   There is a bona fide, actual, present, and practical need for this declaration.

216.   Defendants have an actual, present, adverse, and antagonistic interest in the subject matter of the declaratory relief sought by Southwest Pari-mutuels, and

all antagonistic and adverse interests over whom this Court is able to exercise jurisdiction are before this Court by proper process.[20]

217.   The declaration sought is not merely the giving of legal advice to answer questions propounded from curiosity.

**WHEREFORE,** Plaintiffs West Flagler Associates, Ltd., and Bonita-Fort Myers Corporation respectfully request this Court, pursuant to 28 U.S.C. §§ 2201 and 2202 and its inherent equitable powers, (1) enter a declaratory judgment, declaring that the online off-reservation sports betting provisions of the 2021 Compact violate the UIGEA and are thus *ultra vires*, because any online sports betting wager and related financial transactions initiated in Florida and off Indian lands are unlawful online gambling and is prohibited by the UIGEA; (2) enter a declaratory judgment, declaring that the online off-reservation sports betting provisions of the Implementing Law violate the UIGEA and are thus *ultra vires,* because any online sports betting wager and related financial transactions initiated in Florida and off Indian lands are unlawful online gambling and is prohibited by the UIGEA; (3) enjoin Defendant Governor Ronald Dion DeSantis from cooperating with the Tribe to secure approval of the 2021 Compact in its current form as mandated by the Implementing Law; (4) enjoin the Defendant Secretary Julie Imanuel Brown from implementing the provisions of Section 285.710,

---

[20]     *See supra* n. 18.

66

Florida Statutes, with respect to online sports betting from anywhere outside the

Tribe's reservations; and (5) award costs to Plaintiffs together with such other and

further relief as this Court deems just and equitable.

Dated:  July 2, 2021                        Respectfully Submitted,

**BUCHANAN INGERSOLL & ROONEY PC**

*/s/ Sheila Oretsky*

Raquel A. Rodriguez, FL Bar No. 511439
Sheila Oretsky, FL Bar No. 31365
Sandra Ramirez, FL Bar No. 1010385
2 South Biscayne Blvd, Suite 1500
Miami, FL 33130
Telephone:  305.347.4080
Fax:  305.347.4089
raquel.rodriguez@bipc.com
sheila.oretsky@bipc.com
sandra.ramirez@bipc.com

Hala Sandridge, FL Bar No. 454362
401 E. Jackson Street, Suite 2400
Tampa, FL 33602
Telephone:  813.222.8180
Fax:  813.222.8189
hala.sandridge@bipc.com

Sydney Rochelle Normil
*Pro hac vice forthcoming*
501 Grant St, St 200
Pittsburgh, PA 15219
Telephone:  412.562.8800
Fax:  412.562.1041
sydney.normil@bipc.com

*Attorneys for Plaintiffs West Flagler*
*Associates, Ltd. and Bonita Fort-Myers*
*Corporation*