## IN THE UNITED STATES DISTRICT COURT
## FOR NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

WEST FLAGLER ASSOCIATES, LTD.,
a Florida Limited Partnership d/b/a
MAGIC CITY CASINO, and
BONITA-FORT MYERS
CORPORATION, a Florida
Corporation d/b/a
BONITA SPRINGS POKER ROOM,

            Plaintiffs,                 CASE NO: 4:21-cv-00270-AW-MJF

v.

RONALD DION DESANTIS, in his
official capacity as Governor of the
State of Florida, and JULIE IMANUEL
BROWN, in her official capacity as Secretary
of the Florida Department of Business
and Professional Regulation,

            Defendants.
_____

## RESPONSE TO MOTION TO DISMISS AMENDED COMPLAINT

Plaintiffs, West Flagler Associates, Ltd., and Bonita-Fort Myers Corporation, by and through their undersigned counsel, respond to the Motion to Dismiss Amended Complaint [DE22] ("Motion") filed by Defendants Ronald DeSantis (the "Governor") and Julie Brown (the "Secretary").

## INTRODUCTION

Plaintiffs ask this Court to declare that the Governor acted *ultra vires* in granting the Seminole Tribe of Florida (the "Tribe") a statewide monopoly on off-

reservation sports betting ("OSB") not authorized by IGRA, and which violates other provisions of federal law and discriminates on the basis of race or national origin. OSB has two components: (1) online betting, which injects gambling into every Floridian's home; and (2) "hub and spoke," which provides for state-regulated pari-mutuels like Plaintiffs to contract with the Tribe. To mollify legislators concerned about the illegality of OSB, the Governor included a severance provision **"in the event that a federal court in Florida"** finds that the "Tribe is not legally permitted to offer Sports Betting" to Florida residents "physically located in the State but not on Indian Lands."  [DE18; ¶130].

After overcoming skepticism about the legality of these provisions to secure legislative ratification by promising that **Florida courts** would sort it out, the Governor seeks to skirt judicial review of what the State previously acknowledged violates the Indian Gaming Regulatory Act ("IGRA"). *See* State of Florida amicus brief, *AT&T Corporation v. Coeur D'Alene Tribe*, 1999 WL 33622330, at *4 (9th Cir. 1999) ("The 'on Indian lands' requirement of IGRA clearly mandates that any Indian gaming activity, including a consumer's play or participation in the game, physically take place on tribal land.").

This bait and switch cannot stand. "[O]nly lawful compacts can become effective, but someone—i.e., the courts—must decide whether those provisions are in fact lawful." *Amador Cnty. v. Salazar*, 640 F.3d 373, 380 (D.C. Cir. 2011). As

2

explained below, Plaintiffs have properly invoked this Court's equitable jurisdiction for limited relief—declaratory judgment and injunctive relief related solely to the Governor's *ultra vires* actions.

## A. The Governor is A Proper Defendant.

Defendants contend that *Ex parte Young*, 209 U.S. 123 (1908), doesn't apply. [DE22; 8-10]. There, the Supreme Court recognized an exception to immunity non-consenting states enjoy in federal court under the Eleventh Amendment. *Reprod. Health Servs. v. Strange*, 3 F.4th 1240, 1255 (11th Cir. 2021). The exception allows parties to sue state officials in their official capacities so long as plaintiffs are "seeking prospective equitable relief to end continuing violations of federal law." *Id.* (citation omitted).

This exception to sovereign immunity is "based on the legal fiction that state officials act ultra vires 'when they enforce state laws in derogation of the Constitution,' and are therefore stripped of official immunity." *Id.* The exception applies whenever the state official has "some connection with the enforcement of the act." *Id*.

The Governor fits squarely into this exception. Defendants admit the Governor must defend the validity of the Compact [DE22; 10], but they conveniently ignore that the Governor has a continuing role to:

- "take all appropriate steps to effectuate [the Compact's] purposes and intent."  (Compact, XIX);

- permit service on him at the Capitol of Compact-required notices to the State (Compact, XV), including notice of the Tribe relocating or expanding its facilities (Compact, IV (C)), changing its Alcohol Beverage Control Act (Compact, V (H)), the State's breach of the Tribe's exclusivity provision (Compact, XI (C)(4)(e)), or the State's non-compliance with its obligations under the Compact (Compact, XII (A)).

Further, the Governor controls the Florida Department of Business and Professional Regulation ("DBPR"), the designated State Compliance Agency that will act as the interface with the Tribe on all issues involving the Compact, some of which will require rulemaking. Agency rules must be approved by the Governor. *See* Fla. Exec. Order No. 11-211 (Oct. 19, 2011). https://www.flgov.com/wp-content/uploads/orders/2011/11-211-ofarr_10-14.pdf

Finally, Fantasy Sports provisions remain in the Compact (Compact IV(A)), but the Legislature did not grant the Tribe a monopoly, as it did with OSB. [DE18; ¶110,111). Exclusivity in off-reservation Fantasy Sports betting is part of the "purposes and intent" of the Compact. The Governor has an ongoing obligation to secure approval granting the Tribe a statewide monopoly with respect to online fantasy sports gaming.

The Governor remains a critical player in implementing and enforcing the Compact, which more than satisfies the requirement that the Governor have "***some*** connection with the enforcement of the act." *Strange*, 3 F.4th at 1255.[1]

---

[1]    All emphasis added unless otherwise indicated.

A similar issue arose in *Artichoke Joe's v. Norton*, 216 F. Supp. 2d 1084 (E.D. Ca. 2002), *aff'd* 353 F.3d 712 (9th Cir. 2003), a case Defendants cite [DE22; 31], but that only further undermines their argument. There, card clubs and charities offering class III gaming in California sued to invalidate a compact the governor signed with various California tribes. Like here, plaintiffs argued the compact violated IGRA, along with other constitutional and statutory provisions.

The court rejected the argument that California's governor fell outside of *Ex parte Young*, and noted that an inability "to link a state officer's actions to a specific enforcement proceeding" would not doom a *Young* suit if "the state officer is shown to have a direct connection to the alleged harm." *Id*. at 1109-10. For this reason, the governor had "a specific connection to the challenged statute" and was therefore a proper party because he "negotiated and approved the compacts that give rise to the plaintiffs' alleged injuries." *Id*. The same is true here.

As the *Artichoke Joe's* court reasoned, "[i]f the plaintiffs' allegations are correct, the Governor violated federal law—IGRA and the Equal Protection Clause—***his actions are ultra vires, and he is subject to suit under Young***." *Id*. The court further found these violations of federal law ongoing because "plaintiffs' alleged injuries from their inability to compete continue until the compacts come to an end, which might not be until 2020." *Id*. at 1111.

Because the Governor is a proper defendant in Plaintiffs' suit for injunctive relief under *Ex parte Young*, he cannot invoke Eleventh Amendment immunity as a defense. *Strange*, 3 F.4th at 1255.

## B. The Secretary is a Proper Defendant.

For all the same reasons, the Secretary is likewise a proper party. Again, the Secretary need only have ***some*** connection with enforcement of the Compact. That requirement is easily satisfied here.[2]

Notably, Defendants do not dispute that DBPR's Division of Pari-Mutuel Wagering (the "Division") is responsible for regulating pari-mutuels and managing Tribe/State compacts. [DE18; 11]. Nor do Defendants dispute that although the Implementing Law created the Florida Gaming Control Commission, the Division continues to regulate pari-mutuels, including issue permits, and manage the Compact until July 1, 2022. *Id*. Instead, Defendants solely argue the Compact fails to confer on DBPR enforcement authority over the *specific* Compact provision Plaintiffs challenge, the OSB. [DE22; 11].

Nothing in *Ex parte Young*—much less any case construing it—requires that the requisite "enforcement authority" ***must*** relate to the specific provision of a law that a party seeks to challenge, even if the agency is responsible for enforcing the

---

[2]      *See, infra*, at 16-17 (discussing DBPR's role as State Compliance Agency under the Compact (Parts V, VI, and VIII) and Implementing Law.

entire law.  Defendants' only cited case says the opposite. "'Unless the state officer has some responsibility to enforce ***the statute _or provision_*** at issue, the 'fiction' of *Ex parte Young* cannot operate.'" *Osterback v. Scott*, 782 F. App'x 856, 859 (11th Cir. 2019) (quoting cite omitted).

### C. The Tribe is not a Necessary and Indispensable Party.

For the reasons stated in the response to the Tribe's Motion to Intervene and to Dismiss for Failure to Join an Indispensable Party, the Tribe is not a necessary or indispensable party. [DE26].

### D. Plaintiffs Have an Equitable Right Under Federal Law to Seek Relief.

In claiming Plaintiffs have failed to state a cause of action, Defendants overlook the traditional, non-statutory equitable cause of action for claims that government officers are violating federal law. Indeed, the Supreme Court reaffirmed the existence of such a cause of action in *Armstrong v. Exceptional Child Center, Inc*., 575 U.S. 320 (2015). Justice Scalia, speaking for the majority, acknowledged that while the Supremacy Clause did not create a private cause of action to sue state officers for violating federal law, "we have long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law." *Id*. at 326-27 ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of

equity, and reflects a long history of judicial review of illegal executive action, tracing back to England.").

Ignoring this long tradition of equitable review, Defendants assert that a state official's federal statutory violation does not trigger a private cause of action in favor of a person that violation harms. [DE22; 12]. But as *Armstrong* makes clear, the issue is not whether IGRA, the Wire Act, or UIGEA ***provide*** a cause of action; it is ***whether Congress has statutorily displaced the traditional equitable remedy for ultra vires official action***. *Armstrong*, 575 U.S. at 329. As the Supreme Court has likewise made clear, courts "should not construe a statute to displace courts' traditional equitable authority absent the 'clearest command,' or an 'inescapable inference' to the contrary." *Miller v. French*, 530 U.S. 327, 340 (2000) (citations omitted). Defendants do not so much as identify *any* statutes that purport to displace the equitable remedy Plaintiffs seek—let alone a statute that does so with the "clearest command."[3]

---

[3]    The equitable tradition *Armstrong* reiterates was not limited by the APA enactment. *See Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) (The APA did "not repeal the review of *ultra vires* actions that was recognized long before."). Rather, as *Armstrong* recognizes, Congress can *displace* such equitable review by statute, but the APA is not such a statute. *Id*. Because Defendants did not argue in their motion to dismiss that *any* statute displaces Plaintiffs' equitable remedy, including the APA, they have waived any such contention. *See infra* at n.15.

Following this unassailable history and *Armstrong,* the Eleventh Circuit has sanctioned the continuing viability of equitable actions seeking injunctive relief against state officials. In *Transcontinental Gas Pipe Line Co. v. 6.04 acres*, 910 F.3d 1130, 1152 (11th Cir. 2018), the court found that "equitable powers of federal courts should be broadly construed to afford complete relief under a statute." Accordingly, the court held that "when a party seeks an equitable remedy from the district court, the district court is presumed to have the authority to grant the requested relief, absent some indication in the underlying statute that such relief is not available." *Id.* The underlying statute must "clearly and validly limit[] the equitable jurisdiction of the district court. . . ." *Id.*[4]

Defendants' reliance on *Alabama v. PCI Gaming Authority*, 801 F.3d 1278 (11th Cir. 2015), is inapposite. [DE22; 12-14]. *PCI Gaming* did not apply *Armstrong* to determine whether IGRA reflects Congress's intent to ***preclude equitable relief.*** Instead, it addressed only whether IGRA creates a private cause of action.

---

[4]    Applying *Armstrong*, courts outside of this circuit have expressly recognized suits for injunctive relief asserting IGRA violations. *Tohono O'odham Nation v. Ducey*, 130 F. Supp. 3d 1301, 1316 (D. Ariz. 2015) (applying *Armstrong* and finding no Congressional intent to foreclose equitable action under IGRA)*; Pueblo of Pojoaque v. New Mexico*, 233 F. Supp. 3d 1021, 1136 (D.N.M. 2017) (recognizing "an equitable cause of action asserting preemption of state law states a cognizable claim," citing *Armstrong* and *Tohono*). The *Pueblo of Pojoaque* court denied relief because plaintiff did not expressly seek equitable relief in its complaint. Plaintiffs expressly invoked this Court's equity jurisdiction. [DE18; ¶¶154, 155, 176, 177, 201, 202, 226].

Defendants' confuse statutory rights with this court's equitable powers.[5] Equitable actions seeking to enjoin *ultra vires* or unconstitutional conduct are entirely different from statutory causes of action. They are not premised on the deprivation of a statutory right, nor depend on the existence of a statutory cause of action. Instead, they seek equitable relief, "a judge-made remedy," *Armstrong*, 575 U.S. at 327, for injuries that stem from unauthorized official conduct. Rather than invoking a legislatively conferred cause of action to vindicate a legislatively created right, such actions rest on the historic availability of equitable review to obtain prospective injunctive relief from harm caused by "unconstitutional" or "ultra vires conduct." *Dalton v. Specter*, 511 U.S. 462, 472 (1994).

Defendants ignore the difference between a claim in equity and the entirely separate act of concluding—as a matter of statutory interpretation—that a right of action is "implied" in a statute. In short, *PCI Gaming* addressed the latter, not whether a plaintiff could prospectively enjoin a state official from taking unconstitutional actions under a court's inherent equitable powers.

---

[5]    Nor does *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996), hold otherwise. There, the Court prohibited the Tribe from using *Ex parte Young* to seek equitable relief that Congress had statutorily authorized through IGRA. The point was not that IGRA displaced all equitable relief; it was that it displaced equitable relief for those claims for which Congress provided an alternative. In other words, the Tribe could not take two bites at the apple—one statutory, one equitable. But *Seminole Tribe* does not hold that parties like Plaintiffs get no equitable bites at the apple to remedy *ultra vires* conduct.

The same test applies to the Wire Act and UIGEA equitable claims. Defendants argue there is no private cause of action under either statute [DE22; 14-15], again entirely missing the point of Plaintiffs' claim.

Defendants' argument that Plaintiffs are invoking the doctrine of "non-statutory review" given Plaintiffs' *ultra vires* allegations is puzzling. [DE22; 15-18]. Plaintiffs assert claims under this court's equitable powers. Defendants' entire "non-statutory review" argument—with its caustic "Hail Mary pass" reference—is a non-sequitur. Equitable actions to restrain *ultra vires* conduct are no longshot; they are an essential feature of the federal courts canon—and have been since our country's founding.

### E. Plaintiffs Have Standing.

The Amended Complaint sufficiently and plausibly alleges all factual elements required for standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (plaintiff's burden to demonstrate standing changes "with the manner and degree of evidence required at the successive stages of the litigation"); *Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1337 (11th Cir. 2021) ("At the pleading stage, 'general factual allegations of injury are enough.'"). "Now is not the time to determine if those [standing] facts are true." *Yelapi v. DeSantis*, 2021 WL 1918784, at *1 (N.D. Fla. Mar. 12, 2021).

1. **Plaintiffs have sufficiently alleged injury-in-fact**.

To demonstrate standing, a plaintiff must show it will suffer an "injury in fact" "fairly traceable" to the defendant's actions, that is "likely to be redressed" by the relief it seeks. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citation omitted).

The injury-in-fact requirement ensures a plaintiff has a personal stake in the litigation. *See List v. Driehaus*, 573 U.S. 149, 157 (2014). Plaintiffs are no "mere bystanders." They allege they are Tribe competitors, which Defendants don't challenge. Plaintiffs have a personal stake in the litigation. Neither Defendant denies Plaintiffs allege injury-in-fact, but assert that concrete injury is "speculative" and "not even plausible." [DE22; 19].

Defendants also don't dispute the allegations that losing patrons will injure Plaintiffs or the high investment needed to enter into an agreement with the Tribe. Defendants question whether Plaintiffs will lose patrons at all. And they assert, without support, that entering into an agreement with the Tribe will offer "favorable financial opportunities." [DE22; 18-19].[6] But at this stage, the Court must accept as true Plaintiffs' plausible factual allegations to the contrary.

---

[6] To the contrary, Defendants attach to their Motion evidence of injury. In the DOI letter, Bryan Newland, the Principal Deputy Assistant Secretary for Indian Affairs makes clear it is highly questionable that the Department will approve marketing agreements with pari-mutuels. [DE22; Ex. 1, p.12].

Defendants' assertion of "speculativeness" about loss of revenue is based on two straw-man arguments:  (1) "Plaintiffs seemingly assume that they will not reach an agreement with the Tribe to participate in the Tribe's online sports betting operation," and (2) "sports betting is and would be illegal at Plaintiffs' pari-mutuel facilities regardless of the Compact, and Plaintiffs fail to establish why patrons wishing to engage in sports betting would visit Plaintiffs' facilities but for the Compact." [DE22; 18-19].

With regard to the first, Defendants misunderstand their own Compact. The Compact permits the Tribe to take both 40% of the "Net Win" and an as-yet underdetermined amount for its expenses, but it doesn't allow Plaintiffs to deduct their expenses from the Net Win portion going to the Tribe.  [DE18; ¶148]. Further, Plaintiffs allege their mobile application development expense to enter into these arrangements will exceed the revenue they would realize. [DE18; ¶147 n.20].

As to the second straw-man, Defendants incorrectly assert Plaintiffs' injury rests on the inability of pari-mutuels to offer OSB. [DE22; 19]. Part of Plaintiffs' injury is based on the allegation that their existing games will lose current patrons migrating towards OSB. [DE18; ¶144]. It is objectively plausible that patrons who bet on pari-mutuel sports, poker, or slots will be attracted to sports betting. Anyone visiting a Las Vegas casino observes gamblers migrating between gaming tables and the sports book.  Once the Tribe offers OSB online, patrons will more likely migrate

to avoid commuting to the Tribe's casinos in Hollywood, Tampa, or Immokalee (the three Tribal casinos closest to Plaintiffs) to place a sports bet; they can place bets from their homes. Plaintiffs have further alleged this convenience (especially in the post-COVID era) will make it less attractive for patrons to travel to Plaintiffs' facilities in Little Havana or Bonita Springs. [DE18; ¶146].

An injury-in-fact must be concrete, particularized, and "actual or imminent," rather than speculative. *Spokeo*, 136 S. Ct. at 1548 (*quoting Lujan*, 504 U.S. at 560). As the Eleventh Circuit further explained in *Muranksky v. Godiva Chocolatier, Inc.*, 922 F.3d 1175, 1185-86 (11th Cir. 2019):

> *Spokeo* reaffirmed a "concrete" injury must be 'de facto'; that is, it must actually exist." ("Concreteness as a discrete requirement for standing, the Court's decisions indicate, refers to the reality of an injury, harm that is real, not abstract, but not necessarily tangible."). But "concrete" is not 'necessarily synonymous with "tangible." After *Spokeo,* as before, "intangible" injuries, including injury in the form of a "risk of real harm," may satisfy Article III's concreteness requirement. *Id.* Nor must the injury (tangible or not) be substantial. *Spokeo* made no change to the rule that "a small injury, 'an identifiable trifle,' is sufficient to confer standing." (citations omitted).

Thus "substantial risk" of injury should not be confused with the quantity of injury. Any amount of plausible risk of injury alleged is sufficient to confer standing at the pleadings stage. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (with respect to stating a claim).

None of Defendants' authorities concern competitor injury allegations. Competitor standing specifically has been recognized in challenges to Indian gaming compacts by cardroom owners and others involved in Class III gaming. *See Artichoke Joe's*, 216 F. Supp. 2d at 1084 and discussion *supra* at 5. The threat of economic injury satisfies the injury-in-fact requirements for standing. *Id.* at 1102.[7]

### 2. Plaintiffs' injuries are fairly traceable to the actions of the Governor and Secretary; the requested relief will redress these injuries.

The Secretary objects to standing based on traceability or redressability as to her. The Governor does not, and thus concedes factually that any injury Plaintiffs establish is "fairly traceable" to him and "likely to be redressed" by the relief sought here. [DE22; 21]. Nor could he given evidence proving (1) Plaintiffs' injuries are fairly traceable to the Governor's actions in negotiating, signing, and submitting the Compact, (2) the Governor has direct control over the Secretary, the official charged

---

[7]    Defendants' cited cases are all distinguishable. *Tsao*, 986 F.3d at 1337 and *Trichell v. Midland Credit Mgmt., Inc*., 964 F.3d 990, 996 (11th Cir. 2020), do not involve alleged ongoing violations of law. In *Salcedo v. Hanna*, 936 F.3d 1162, 1167 (11th Cir. 2019), the complained-of text message occurred in the past and there was no plausible allegation of ongoing violations. In *Esteves v. SunTrust Banks, Inc*., 615 F. App'x 632, 635 (11th Cir. 2015), there was no allegation of harm resulting from statutory violations.

by the Implementing Law with ensuring that the Tribe complies with the Compact, (3) the Governor has ongoing responsibilities to advance the purposes of the Compact, and (4) the Governor has ongoing obligations to secure approval granting the Tribe a statewide monopoly with respect to online fantasy sports. *See supra* at 3-4.

Otherwise, Defendants' own authorities support standing to sue the Secretary with respect to the traceability and redressability prongs. In *Support Working Animals, Inc. v. Governor of Florida*, 2021 WL 3556779 (11th Cir. Aug. 12, 2021), the Eleventh Circuit noted these prongs require suing the official charged with enforcing the challenged law in a pre-enforcement challenge to the Florida constitutional ban on greyhound racing. In that case, plaintiffs sued the Attorney General, when it was DBPR that had the authority to impose administrative fines for violations of the greyhound racing ban. *Id* at *3.

Defendants ignore that the Secretary, as DBPR head, has a central and material role in implementing the Compact, both through her direct oversight responsibilities to ensure Tribal adherence to the Compact and her power to adjudicate disputes between a betting patron and the Tribe. § 285.710(1)(f), Fla. Stat.; Compact, VIII.A., C.1. ("the State is entitled to conduct random inspections. . . to assure that the Tribe is operating in accordance with the terms of the Compact. .

. . the SCA may monitor the conduct of Covered Games to ensure that the Covered Games are conducted in compliance with the provisions of this Compact.").

Far from the law "remaining on the books," a decision here that the OSB provisions are *ultra vires* or unconstitutional, means that (1) the OSB provisions are severed automatically from the Compact, and (2) the Tribe's engaging in such games would not be "in compliance with the provisions of this Compact," against which eventuality DBPR as the SCA is charged with ensuring. The Secretary will be bound to find any continued OSB by the Tribe non-compliant with the Compact. § 285.710(13)(b), Fla. Stat.; Compact, XIV.A.

Further, the Compact provides that the SCA (DBPR) has the final word on all appeals of disputes between the Tribe and a bettor. Compact, VI.A. ("the decision of the SCA shall be binding on the Tribe and the Patron."). Again, a ruling here would necessarily affect DBPR's ability to adjudicate any OSB dispute between a patron and the Tribe.

Article III standing does not require a defendant be the most immediate cause, or even a proximate cause, of the plaintiff's injuries; it requires only that those injuries be "fairly traceable" to the defendant. *See Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118, 134 n.6 (2014). Because Plaintiffs assert no damage claim, but a declaratory injunction action seeking prospective injunctive

relief, Plaintiffs need not allege past action by the Secretary; her ongoing obligations as head of the current State Compliance Agency–DBPR–are enough.

Unlike *Jacobson* or *Support Working Animals*, Defendants here are the two officials who together and separately comprise both the cause of Plaintiffs' injury (negotiating, signing and implementing the Compact) and the proper parties for redress of Plaintiffs' injuries (continuing obligations to implement and to verify compliance). In addition to his ongoing responsibilities under the Compact, the Governor supervises and has the sole authority to remove the Secretary from her office. Fla. Stat. §20.165(1). Thus, even if the Court found no traceability to the Secretary and the Governor were the only Defendant, redress also would be available because of his authority to direct the Secretary.

In contrast, in *Jacobson* and *Support Working Animals,* plaintiffs sued the wrong constitutional officer who had no control over the officer with respect to whom the injury was traceable and redressable. *Jacobson*, 974 F.3d at 1253 ("Our conclusion that any injury from the ballot is not traceable to the Secretary rests on the reality that the Supervisors are independent officials under Florida laws who are not subject to the Secretary's control."); *Support Working Animals*, 2021 WL 3556779, at *4 (Attorney General had no role in enforcing greyhound ban and no direct authority over state attorneys or DBPR).

18

### F. The OSB Provisions Violate IGRA.

25 U.S.C. § 2710(d)(1) provides that "Class III gaming activities **shall be lawful on Indian lands** only if such activities are," among other things, located in a State that permits such gaming and conducted in conformance with a Tribal-State compact.

Despite IGRA's express language, Defendants claim the Tribe can offer patrons online sports betting in their Florida homes or at pari-mutuels off Indian lands without violating IGRA's limitation to gaming on Indian lands. [DE22; 23-24]. Defendants assert that IGRA affirmatively authorizes Indian tribes to offer gaming activities to patrons who are physically located off Indian lands. [DE22; 23].

This radical rewriting of IGRA finds support in precisely zero cases. And it depends upon a complete inversion of how IGRA operates. Whereas the central point of IGRA is to provide the legal framework and authority for *on-reservation* tribal gaming, Defendants reimagine it not to prohibit *off-reservation* tribal gaming—missing the point that, without the authorization IGRA provides, such a compact itself is invalid.

Defendants read IGRA as simply not speaking to off-reservation activities – so therefore it is not prohibited. That puts the cart before the horse. The Compact is only authorized if consistent with IGRA. 25 U.S.C. § 2710(d)(8)(C) (DOI Secretary can only approve compact complying with IGRA); *Amador County*, 640 F.3d at 380

(sub-section (d)(8)(C) "provides that only lawful compacts can become effective"). Because the Compact can only address gaming on tribal lands, but the Compact permits gaming off tribal lands, the Governor's actions are *ultra vires* as unauthorized under IGRA.

Moreover, no one argues the Tribe could not theoretically offer gaming off Indian land. However, if the Tribe does, IGRA no longer applies. *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 795 (2014) ("Everything-literally everything-in IGRA affords tools (for either state or federal officials) to regulate gaming on Indian lands, and nowhere else.").

Instead, Florida law does. Yet Florida constitutionally prohibits all gambling, which includes sports betting, unless the citizens approve it. Art. X, Sec. 32, Fla. Const. ("Amendment 3"). Further, the Tribe has no pari-mutuel license to offer any gaming in Florida. The State and Tribe cannot hide behind IGRA to negotiate a compact circumventing state law applicable to off-reservation gaming when IGRA itself does not apply to such gaming.[8] Such a "heads, we win; tails, you lose" argument turns IGRA on its head.

Defendants' legal support falls short. They first reference 25 U.S.C. § 2710(d)(3)(C)(i), (ii). [DE22; 24]. This IGRA section states:

---

[8]    The Compact itself also does not purport to be made pursuant to anything other than IGRA.

(C)    Any Tribal-State compact negotiated under subparagraph (A) may include provisions relating to—

(i)    the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;

(ii)    the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations

The plain language solely addresses the application and allocation of criminal and civil laws between a state and a tribe in a compact. Nothing in this language remotely permits a state and tribe to enter into a compact *that creates its own law* to "deem the gaming activity of patrons placing wagers while located physically outside Indian lands but within the state to take place on the Tribe's Indian lands." [DE22; 23].

Next, Defendants rely on *PCI Gaming Authority* and *Bay Mills*, 572 U.S. at 794, to argue that "IGRA does not prohibit gaming activity taking place outside Indian lands" because "IGRA does not govern gaming that occurs outside of Indian lands." [DE22; 24]. This reasoning is as incoherent as it is circular. IGRA authorizes certain gaming activities, and authorizes the adoption of compacts *consistent* with its requirements. Compacts that purport to authorize gaming in circumstances in

which IGRA does not apply are, by definition, inconsistent with IGRA.[9] IGRA is designed to provide a statutory framework for gaming on Indian lands – not off Indian lands. *See Coeur D'Alene Tribe*, 295 F.3d at 915 (Gould, J., dissenting) ("IGRA protects and advances on-reservation gaming; the proposed national lottery involves and encourages illegal gaming nationwide off the reservation and is not within the purview of the IGRA"). Outside Indian lands, the Tribe is subject to the same licensure rules as everybody else.

Despite this, Defendants maintain *Bay Mills* holds that "a state and a tribe are free to negotiate a compact that includes terms governing conduct or gaming outside Indian lands." [DE22; 24]. This assertion is pure fantasy. *Bay Mills* only notes a state and tribe ***can*** include terms related to waiving sovereign immunity to allow the state ***to sue the tribe*** for gaming off Indian lands—which is illegal when not in compliance with state law.[10] No case approves the legality of a compact under IGRA that allows gaming off Indian land in violation of state law.

---

[9]    Defendants' reliance on *Chicken Ranch Rancheria of Me-Wuk Indians v. Newsom*, 2021 WL 1212712, at *2 (E.D. Cal. Mar. 31, 2021), is puzzling.  [DE22; 24].  Defendants cite it to argue that "***legal gaming*** activity may be included in an IGRA compact when the necessary nexus to Class III gaming activity is met." *Id.* Even if online sports betting were legal in Florida, nowhere did the court hold that a compact could authorize a tribe to offer patrons gaming off Indian lands because it is "related to" Class III gaming.

[10]    States have no authority to redefine the meaning of federal statutes— including IGRA's definition of "tribal lands"—which would "turn[ ] the Supremacy Clause on its head." *United States v. Di Pietro*, 615 F.3d 1369, 1373 (11th Cir. 2010);

Defendants confuse the question of what IGRA says is legal with who can enforce what. *Bay Mills*, for instance, addressed what express and implied rights Michigan had under IGRA to sue tribe officials for violating IGRA. As Plaintiffs have explained, they have not invoked an IGRA remedy, but this Court's equitable powers to enjoin a state officer's *ultra vires* conduct. Defendants' plucked citations that were wholly out-of-context with respect to the issues before those courts.

Simultaneously, Defendants avoid the one case directly on point. In *California v. Iipay Nation of Santa Ysabel* ("*Desert Rose*"), 898 F.3d 960, 967 (9th Cir. 2018), the Ninth Circuit held that the tribe could not operate an online bingo site despite the server being on Indian lands as "the patrons [were] engaging in 'gaming activity' by initiating a bet or a wager in California and off Indian lands . . . [thus,] some of the 'gaming activity' associated with [Desert Rose Bingo] d[id] not occur on Indian lands. . . ."

The court held that a wager placed off Indian lands cannot be "deemed" to be placed on Indian lands simply because of the location of the server. *Id*. at 968 ("IGRA protects gaming activity conducted on Indian lands. However, the patrons' act of placing a bet or wager on a game of DRB while located in California constitutes a gaming activity that is not located on Indian lands.").

---

*Odebrecht Constr., Inc. v. Prasad*, 876 F. Supp. 2d 1305 (S.D. Fla. 2012) (Florida statute was unconstitutional as its purpose and language was inconsistent with federal law and policy).

Defendants' response to this judicial IGRA authority cited in Plaintiffs' complaint? None. Instead, Defendants improperly rely on language contained in a letter from the Department of Interior applauding the Tribe's efforts to use technology to expand its commercial gaming business. [DE22; 24-25]. This letter is outside the four corners of the Amended Complaint, and this Court should ignore it. Nor is it binding on this Court because it does not purport to exercise the force of law. See *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) (explaining that "an interpretation contained in an opinion letter," as opposed to the result of "a formal adjudication or notice-and-comment rulemaking," does "not warrant *Chevron*-style deference" because it "lack[s] the force of law").[11] Regardless, "deference is not due unless a 'court, employing traditional tools of statutory construction,' is left with an unresolved ambiguity." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018) (*quoting Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984)).

No ambiguity exists here, the plain meaning is clear. Gambling must occur "on Indian lands." Even Defendants admit a patron's online bet does not occur on

---

[11]    Bryan Newland, the Principal Deputy Assistant Secretary for Indian Affairs, has previously taken the exact opposition position by recognizing that OSB is off-reservation betting. Matthew Kredell, How Michigan Tribes Learned to Stop Worrying and Love Online Gambling, PlayMichigan.com (July 30, 2020) https://www.playmichigan.com/tribal-casinos-michigan-online-gambling-bay-mills/ (last visited September 13, 2021).

the Tribe's land. Its Compact must "deem" it to be occurring on the Tribe's land for it to be on Indian land—because it is not. Under Section 2710(d)(1)'s plain meaning, Class III gaming falls under IGRA's protections only if *ON* Indian land. No amount of "deeming" can magically transport a patron sitting at her home into the Tribe's casinos.[12]

If Defendants believe Congress should change its "on Indian lands" limitation, they are in the wrong place.[13] This Court is "not empowered to rewrite statutes." *Albritton v. Cagle's, Inc*., 508 F.3d 1012, 1017 (11th Cir. 2007) *citing Artuz v. Bennett*, 531 U.S. 4, 10 (2000). The court's "function is to apply statutes, to carry out the expression of the legislative will that is embodied in them, not to 'improve

---

[12]    The Indian canon of construction favoring a tribe's interpretation cannot trump plain meaning. *Connecticut v. Dep't of Interior*, 344 F. Supp. 3d 279, 309 (D.D.C. 2018) ("The Court begins, as it must, with the text of the IGRA governing the approval of tribal-state compacts and secretarial procedures, and amendments thereto. If the text is plain, the Court must enforce it according to its terms.") *citing Hardt v. Reliance Standard Life Ins. Co*., 560 U.S. 242, 251 (2010). The [Indian] canon "has force only where a statute is ambiguous." *Id*. at 314 (quoting *El Paso Nat. Gas Co. v. United States*, 632 F.3d 1272, 1278 (D.C. Cir. 2011).

[13]    A bill was proposed, but did not pass. *See*, *e.g*., H.R. 5502, 116th Cong. (2019) (proposing an act "To remove Federal barriers regarding the offering of mobile sports wagers on Indian lands when the applicable State and Indian Tribe have reached an agreement, and for other purposes"), *available at* https://www.congress.gov/bill/116th-congress/house-bill/5502/text. And tribes sought such authority in 1998 from Congress, but were rejected. 144 Cong. Rec. S8117 (1998), attached as Ex. A.

statutes by altering them.'" *Wright v. Sec'y for the Dep't of Corrs.*, 278 F.3d 1245, 1255 (11th Cir. 2002).

Defendants' remedy to enter into a Compact that permits illegal gaming off tribal lands is with Congress, not this Court (or with DOI, which is equally bound by Congress' express language in IGRA). Because the Compact and the Implementing Law portions that purport to authorize any off-reservation sports betting fail to comply with IGRA's "on Indian lands" requirement, these portions of the Compact and the Implementing Law are unauthorized under IGRA and *ultra vires*. 25 U.S.C. §§ 2703(4); 2710(d).[14]

## G. The OSB Provisions Violate The Wire Act and UIGEA.

Plaintiffs have clearly pled the OSB provisions are illegal in Florida and violate both the UIGEA and Wire Act.[15] Importantly, ***Defendants do not deny that OSB on mobile devices or internet involves interstate commerce.*** Instead, Defendants incorrectly argue the Compact violates neither law.

The UIGEA prohibits "unlawful Internet gambling." 31 U.S.C. § 5361(4). Unlawful Internet gambling occurs when an individual places, receives or transmits

---

[14]    Other than raise its unsupported statutory construction argument, Defendants raise no other arguments related to Count I, thereby abandoning them. *Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146, 1152 (11th Cir. 2011) ("It is well settled that issues not raised in the district court in the first instance are forfeited.").

[15]    Courts view complaint allegations in the light most favorable to plaintiffs. *Jackson v. Okaloosa Cnty.*, 21 F.3d 1531, 1534 (11th Cir. 1994).

a "bet or wager by any means which involves the use, at least in part, of the Internet where such bet or wager is unlawful under any applicable Federal or State Law in the State or Tribal lands in which the bet or wager is initiated, received or otherwise made." 31 U.S.C. § 5362(10)(A). Under UIGEA, for a bet or wager placed over the Internet to be lawful, the bet must be legal in the State or Tribal lands where the bet or wager is placed ***and*** in the State or Tribal lands where the bet or wager is received. 31 U.S.C. § 5362(10)(A).

Online sports betting is illegal in Florida; the legislature cannot expand gambling unless approved by voters *via* a citizen's initiative. *See* Amendment 3. Under IGRA, as outlined above, Class III gaming activities are lawful ***on Indian lands*** only if the activities are "located in a State that permits such gaming for any purpose, by any person, organization or entity." 25 U.S.C. § 2710(d)(1)(B).

The Governor and Legislature cannot unilaterally circumvent this unequivocal State constitutional prohibition or IGRA's limitations by legalizing OSB through the Compact and Implementing Law, pretending it's on the reservation outside the reach of Amendment 3. "Neither the Governor nor anyone else in the executive branch has the authority to execute a contract that violates state criminal law." *Florida House v. Crist*, 990 So. 2d 1035, 1050 (Fla. 2008).

Defendants likewise ignore the State's admission in prior litigation that any Indian gaming activity must occur on Indian lands to receive IGRA's protections:

> The existence of a phone bank and a centralized computer system on the Coeur D'Alene reservation does not change the uncontested fact that the person making the wager is located outside of Idaho, and clearly not on the reservation. ***As a consequence, because the wager is placed off the reservation, the gaming activity is not conducted "on Indian lands" as plainly required by IGRA."***

*See Brief for Amici Curiae in Support of AT&T Corporation and Affirmance*, 1999 WL 33622330 at 4, *Coeur D'Alene Tribe v. AT&T Corp*., 295 F.3d 899 (9th Cir. 2002) (No. 12) (filed by Florida and Minnesota attorney generals) (footnotes and citations omitted).

Recently, the State took a comparable position when the Governor signed Senate Bill 50 requiring remote sellers to collect and remit sales tax on online purchases. *See Fla. Stat*. § 212.05965, effective July 1, 2021. A buyer physically located in Florida making a purchase from an out of state seller must pay sales tax on the purchase. This law establishes that, for online activity, ***what matters is the physical location of the purchaser, not where the seller's server is located.***

During the Compact debate, one State Representative highlighted the inconsistency between this new law and online sports betting under the Compact. Demanding "intellectual honesty," he remarked:

> And in that online sales tax bill everybody was jumping up and down and talking about how the transaction occurs when you make the purchase, and it occurs in Florida, and we need to collect our sales tax, and we need to get our piece, and that is where it happens. But then when we are

> talking about when you place a bet, from that same mobile
> phone, all of a sudden no the transaction occurs where the
> server is so no it is different.

*See* May 17th House Select Subcommittee on the Seminole Gaming Compact:

https://thefloridachannel.org/videos/5-17-21-house-select-subcommittee-on-the-seminole-gaming-compact/ (2:55).

Using a person's physical location as the litmus test for these laws coincides with other Florida precedent. *Florida Dep't of Rev. v. Seminole Tribe of Florida*, 65 So.3d 1094 (Fla. 4th DCA) (enforcing tax on fuel purchased off tribe's reservation, even if used for tribe's sovereign functions). *See* analogously *Otoe-Missouria Tribe of Indians v. N.Y. Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 360 (S.D.N.Y. 2013) (rejecting tribe's argument that when a consumer comes to a tribe's website for a loan, the "consumer travel[s] to Tribal land via the Internet").

Given this background, UIGEA's plain language proves the Compact's illegality—***the Court is to look at the law where both the bet is made and the wager is received.*** *See* 31 U.S.C. § 5362(10)(A).

*Desert Rose* supports Plaintiffs' UIGEA argument. There*,* a California tribe began operating Desert Rose Casino and launched a game called Desert Rose Bingo ("DRB"), an exclusively server-based bingo game that allows its patrons to play bingo over the internet. California sought injunctive relief to prohibit the tribe from operating DRB because it violated IGRA and UIGEA. The Court agreed and

affirmed the district court's order granting summary judgment in favor of the state. *Ipay Nation of Santa Ysabel*, 898 F.3d at 965.

Defendants cannot distinguish *Desert Rose* in any meaningful way. Regardless of who brought the case or what that compact stated, online bingo is illegal in California and therefore the bingo game violated UIGEA and California state law. *Id.* Similarly, it doesn't matter whether the tribe in *Desert Rose* admitted where the bets take place because the fact remains that the Compact is based on a legal fiction that the conduct is "deemed" to take place somewhere it does not. Regardless, the State has similarly made such an admission as set forth above.

The Compact also violates the Wire Act, which makes it illegal to use "wire communication facility" to transmit sports bets through "interstate… commerce" unless the bettor and bet recipient are both in a state where such bets are legal. Defendants do not deny that mobile and internet transmissions involve interstate commerce. 18 U.S.C. § 1084(a). Instead, Defendants' entire argument rests on a tortured reading of Plaintiffs' Wire Act claim that, they aver, would capture "even onsite sports betting…because there can be no doubt that Internet transmissions and out-of-state payment processor transmissions are utilized in that context as well." [DE22; 26]. This, Defendants argue, "is an expansive reading of the statute" and would result in "all intrastate, onsite casino operations" violating the law. *Id.*

30

This is not what Plaintiffs allege or how the statute reads. Its plain text, including the narrow exception in 18 U.S.C. § 1084(b), unambiguously show the Wire Act does not prohibit sports bets that occur wholly within a state where sports betting is legal. If that were the case, Section 1084(b)'s exemption allowing sports betting between states where sports betting is legal would be meaningless. Defendants' reading would lead to an absurd interpretation where interstate sports betting between two states would be legal, but intrastate sports betting would not.

Defendants also wrongly argue that Plaintiffs' Wire Act interpretation would make illegal online sports betting that takes place wholly on Indian land. The State obviously can allow any form of gambling on Indian lands pursuant to IGRA. A basic tenet of statutory construction is that "'provisions in different statutes should, if possible, be interpreted so as to effectuate both provisions.'" *Udell v. United States (In re Udell)*, 454 F.3d 180, 184-85 (3d Cir. 2006) (citing *Cutair v. Marshall,* 590 F.2d 523, 530 (3d Cir. 1979); *United States v. Borden Co.*, 308 U.S. 188, 198 (1939) ("When there are two acts upon the same subject, the rule is to give effect to both if possible.")).

IGRA governs what occurs on Indian land; the Wire Act, enacted prior to IGRA in 1966, only deals with states and foreign countries. The Wire Act would not apply to sports gambling exclusively "on Indian land." Reading the statutes in this manner reconciles them and gives effect to both.

What Florida cannot do is allow its citizens to bet from its own sovereign borders outside Indian lands using interstate communications like mobile phones or the internet, because Amendment 3 requires voter-approved expansion of Class III gaming anywhere else in the state. And this is why the Implementing Law adopted the untenable legal fiction that the bets are "deemed place" where the servers are located and is *ultra vires*.

**H. The OSB Provisions Violate the Equal Protection Clause.**

Defendants rely on *Morton v. Mancari*, 417 U.S. 535, 552 (1974), to argue that "the Supreme Court has recognized that "[l]iterally every piece of legislation dealing with Indian tribes . . . single[s] out for special treatment tribal Indians living on or near reservations." But when a state enacts a preference based on tribal ancestry outside the specific authority of federal law, its racial and national origin preferences do not enjoy the same status. *Rice v. Cayetano*, 528 U.S. 495, 514-17, 520 (2000) (citing *Mancari*, 417 U.S. at 554) (limiting *Mancari* to its facts and holding that state imposed voting preference in favor of persons of Hawaiian ancestry for a land trust agency violated Fifteenth Amendment).

As *Rice* demonstrates, the key phrase in Defendants' argument is "[li]terally every piece of legislation. . . ."  Indian tribes' special treatment is controlled by the **language of that legislation**. So, too, goes IGRA. Congress authorized special gaming privileges for Indian tribes. But there's a hitch, it is limited to gaming **on**

*Indian land*. The tribes do not receive special privileges unavailable to others when there is no Congressional authority—and attendant legislation—for it. The permissible preference ends at the edge of the reservation.

Indeed, as the Supreme Court noted, "[u]nless federal law provides differently, 'Indians going beyond reservation boundaries' are subject to any generally applicable state law." *Bay Mills*, 572 U.S. at 795 (citations omitted). This would include criminal penalties for illegal gambling (sports betting currently is illegal in Florida). "Absent any similar language referencing off-reservation gaming activities, Congress did not intend to preempt state regulations of such activities. *Expressio unius est excusio alterius*." *Pueblo of Pojoaque*, 233 F. Supp. 3d at 1120.

Defendants' cases unremarkably reject an equal protection claim when the challenged gaming activity is **on *Indian land*.** *See United States v. Garrett*, 122 F. App'x 628, 631 (4th Cir. 2005). In *Artichoke Joe's*, 353 F.3d at 735, the court noted this distinction, saying "[t]hese governing powers and economic rights extend only as far as the borders of Indian lands. Once outside, the tribes shed their sovereignty and are fully amenable to state law. Under IGRA, for example, individual Indians (or even Indian tribes) could not establish a class III gaming establishment on non-Indian lands."

In sum, Defendants provide no authority permitting racial preferences unsupported by any Congressional legislation. Federal law limits the granted

preferences to Indian lands. Defendants' cases involve a court rejecting an equal protection claim when the challenged gaming is *ON* Indian land. Defendants cite no cases supporting this type of broad preference *OFF* Indian lands.

The Implementing Law grants a race and national origin based monopoly throughout Florida. Based on the new law, the Tribe and those contracting with it will not be subject to criminal prosecution for internet gaming throughout Florida, yet Plaintiffs and every other Floridian will be subject to prosecution.

## CONCLUSION

For all the above reasons, this Court should deny Defendants' Motion. The Governor and Secretary are proper parties and this Court has equitable jurisdiction to enjoin them from taking *ultra vires* action. Alternatively, the Court should grant Plaintiffs leave to amend.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

Pursuant to Local Rule 7.1(F), undersigned counsel certifies that the above-filed Motion and Memorandum of Law contain a total 7960 words.

Dated:  September 14, 2021.

Respectfully Submitted,

**BUCHANAN INGERSOLL & ROONEY PC**

*Raquel A. Rodriguez*
Raquel A. Rodriguez, FBN 511439
A. Sheila Oretsky, FBN 31365
Sandra Ramirez, FBN No. 1010385

2 South Biscayne Blvd, Suite 1500
Miami, FL 33131
Telephone:  305.347.4080
Fax:  305.347.4089
raquel.rodriguez@bipc.com
sheila.oretsky@bipc.com
sandra.ramirez@bipc.com

Hala Sandridge, FBN 454362
401 E. Jackson Street, Suite 2400
Tampa, FL 33602
Telephone:  813.222.8180
Fax:  813.222.8189
hala.sandridge@bipc.com

Sydney Rochelle Normil
(admitted *pro hac vice*)
501 Grant St, St 200
Pittsburgh, PA 15219
Telephone:  412.562.8800
Fax:  412.562.1041
sydney.normil@bipc.com
(admitted pro hav vice)


*Attorneys for Plaintiffs West Flagler*
*Associates, Ltd. and Bonita Fort-Myers*
*Corporation*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 14, 2021, I electronically filed the foregoing document with the Clerk of Court using CM/ECF, which will send a Notice of Electronic Filing to the following: to all counsel of record that are registered with the Court's CM/ECF system.

*/ Raquel A. Rodriguez*
Raquel A. Rodriguez, FBN 511439

35